The plaintiff, Richard Gaut, appeals from a summary judgment in favor of the defendants, Holnam, Inc. ("Holnam"), and Sal Medrano. The issue is whether the trial court erred in holding that Gaut, an employee of Industrial Services of Mobile, Inc. ("Industrial"), became a "special employee" of Holnam by virtue of an agreement between Holnam and Industrial and therefore is barred, by the exclusivity provision of the Workers' Compensation Act, from bringing a tort action *Page 363 
against Holnam[1] for injuries he suffered while working at Holnam's plant.
Industrial, according to the affidavit of its president, Terry Holsonback, provides "personnel service in the form of general labor force employees to businesses on a temporary or as needed basis." Holnam manufactures and sells cement. On November 1, 1989, Industrial contracted to provide "[p]ersonnel [s]ervices as required by [Holnam] for the period of November 1, 1989, through October 31, 1990," for maintenance at Holnam's plant.[2] The thrust of the agreement is specifically set out in the section entitled "Payment for Services":
 "[Holnam] shall pay contractor [Industrial] pursuant to wage rates and classifications agreed to and listed as Exhibit A. Industrial Services will provide home office accounting and clerical services for the preparation and paying of all payrolls."
Holnam paid Industrial according to the number of hours worked by the laborers Industrial supplied, not by the amount of maintenance performed.
The wage rate paid by Holnam for each employee furnished by Industrial included the following components: the amount actually paid to the employee by Industrial; payroll taxes and insurance; an allowance for the tools used by Industrial employees; and other compensation for "general supervision, benefits, home office overhead and profit."[3] Industrial "agree[d] to carry insurance and workmen's compensation acceptable to" Holnam. Holnam itself specifically agreed to carry workers' compensation insurance pursuant to the Jones Act on Industrial's employees that were engaged in activities on certain ships belonging to Holnam; Holnam also expressly reserved the right to unilaterally terminate these ship-based employees, but did not expressly reserve that right as to any other employees. Holnam also required Industrial to obtain a Mine Safety and Health Act (MSHA) number for safety purposes. The agreement provided that Industrial was to be held accountable as a "contractor" to the MSHA agency. Industrial is referred to as a contractor throughout the agreement.
On November 11, 1989, Richard Gaut went to an Industrial office at Holnam's plant to apply for employment with Industrial. Industrial's application identified it as "General Contractors, Constructors Engineers" performing "Complete Plant Maintenance Service," not as an employment agency. Gaut was hired and began doing maintenance work at the plant; he worked full-time at the plant until December 30, 1989. During that approximately seven-week period, Industrial paid Gaut's wages and made state and federal tax withholdings and unemployment withholdings from his paycheck. Industrial provided hardhats that were either plain or had "Industrial Services" written on them. Industrial furnished tools for its employees and stored them in an area referred to as the "Industrial Services work equipment room." Industrial was generally responsible for coordinating the work schedules of Gaut and the other Industrial employees and dictated his lunch and other break schedules. Industrial had supervisors on the job sites.
Although Industrial supplied all of Holnam's maintenance crews and completely handled the administrative and accounting aspects of the maintenance crews, Holnam exercised a great deal of control over the activities of the Industrial employees on the job site. Holnam supervisors often gave orders to the Industrial employees; sometimes these orders were given directly, and sometimes they were relayed to the employees via Industrial supervisors. *Page 364 
On December 30, 1989, Sal Medrano, a Holnam supervisor, ordered Gaut and several other Industrial employees to remove some pieces of clay from a conveyor belt. As Gaut attempted to remove the clay, he fell onto the moving belt and was severely injured when his leg became caught in the "snub roller" — a piece of machinery located at the end of the belt used to break up objects. Following the accident, Industrial filed an accident report with the MSHA agency, stating that Gaut was its employee and that he had been injured while performing maintenance on Holnam's premises. Industrial then entered into a settlement with Gaut for his workers' compensation benefits.
Gaut brought an action against Medrano and Holnam based on his injuries, alleging, inter alia, that they had failed to provide him, as an employee of an independent contractor, with a safe working environment after exercising a substantial amount of control over the manner in which he performed his duties. In their answer, the defendants alleged that Gaut's action was barred by the exclusive remedy provision of the Workers' Compensation Act. The circuit court entered a summary judgment for the defendants, based on its determination that Gaut was a special employee of Holnam and that he was therefore barred by the exclusivity provision from bringing an action against Holnam.
Alabama Code 1975, § 25-5-53, provides that an action brought under the Workers' Compensation Act is the exclusive remedy for an employee's injuries sustained in the course of his employment. Rhodes v. Alabama Power Co., 599 So.2d 27
(Ala. 1992). The exclusivity bar is an affirmative defense. Rule 8(c), Ala.R.Civ.P. Therefore, on a motion for summary judgment, the defendants have the burden of establishing a prima facie showing as to each element of the defense of exclusivity; if the defendants are able to carry this burden, then the plaintiff must present substantial evidence to overcome this prima facie case. A.R.Civ.P. 56; Ala. Code 1975, § 12-21-12. Substantial evidence has been defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co.of Florida, 547 So.2d 870, 871 (Ala. 1989). Also, in reviewing a summary judgment, we must resolve all reasonable doubts in favor of the nonmovant. Hanners v. Balfour Guthrie, Inc.,564 So.2d 412 (Ala. 1990).
The exclusive remedy provision extends to "special employers," which have been described as "individuals or businesses who, for practical purposes, may be considered primary or co-employers of the injured employee." Rhodes,supra, at 28 (quoting Tweedy v. Tennessee Valley Authority,882 F.2d 477, 479 (11th Cir. 1989)). In Terry v. Read SteelProducts, 430 So.2d 862 (Ala. 1983) this Court adopted a three-pronged test for determining when an employee of a general employer can become the employee of a "special employer" for purposes of workers' compensation:
 " 'When a general employer lends an employee to a special employer, the special employer becomes liable for workmens' compensation [and thus immune from liability for tort actions brought by the special employee] only if
 " '(a) the employee has made a contract of hire, express or implied, with the special employer;
 " '(b) the work being done is essentially that of the special employer; and
 " '(c) the special employer has the right to control the details of the work.
 " 'When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmens' compensation.' "
430 So.2d at 865 (quoting 1C A. Larson, The Law of Workmen'sCompensation, § 48 (1980)). The requirement of a contract of hire comports directly with our Workers' Compensation Act, which defines an "employee" as a "person in the service of another under any contract of hire, express or implied, oral or written." Ala. Code 1975, § 25-5-1(5).[4] *Page 365 
This test has been applied in several cases: see Hicks v.Alabama Power Co., 623 So.2d 1050 (Ala. 1993); Rhodes v. AlabamaPower Co., 599 So.2d 27 (Ala. 1992); Pinson v. Alabama PowerCo., 557 So.2d 1236 (Ala. 1990); Means v. International Systems,Inc., 555 So.2d 142 (Ala. 1989); Marlow v. Mid South Tool Co.,535 So.2d 120 (Ala. 1988); Bechtel v. Crown Central PetroleumCorp., 495 So.2d 1052 (Ala. 1986); Pettaway v. Mobile Paint Mfg.Co., 467 So.2d 228 (Ala. 1985); Tweedy v. Tennessee ValleyAuthority, 882 F.2d 477 (11th Cir. 1989).
Gaut argues that the trial court erred in holding that the evidence submitted by the defendants satisfied the first two elements of the Terry test as a matter of law. Gaut does not argue that Holnam did not exercise a right to control the details of his work.
The first element of the Terry test is not satisfied as a matter of law in the record before us. For Gaut to have become the special employee of Holnam, he must have made a contract of hire, either express or implied, with Holnam. This is an important determination, for when a person enters into an employer-employee relationship with a party, that person gives up valuable rights, including the common law right to bring an action against the party for any injury he might suffer while acting in the scope of his employment. Professor Larson makes this point in his treatise:
 "Although the lent-servant doctrine is a familiar one at common law, and has produced some of the most venerable and most intricate cases in the law of master and servant, it is necessary to stress once more that the workmen's compensation lent-employee problem is different in one significant respect: There can be no compensation liability in the absence of a contract of hire between the employee and the borrowing employer. For vicarious liability purposes, the spotlight was entirely on the two employers and what they agreed, how they divided control, how they shared payment, and whose work, as between themselves, was being done. No one paid much attention to the employee or cared whether he had consented to the transfer of his allegiance, since, after all, his rights were not usually as a practical matter involved in the suit. In compensation law, the spotlight must now be turned upon the employee, for the first question of all is: Did he make a contract of hire with the special employer? If this question cannot be answered 'yes,' the investigation is closed, and there is no need to go on into tests of relative control and the like.
 "This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit."
Larson, supra, §§ 48.11 and 48.12. Here, Gaut made no express contract with Holnam; therefore, the judgment can be affirmed only if the record shows that Gaut entered into an implied contract of hire with Holnam and there is no genuine issue as to that fact. Gaut asserts that he had no knowledge of the agreement between Holnam and Industrial; he states that he always believed that Industrial, not Holnam, was his employer; and he states that he believed that only Industrial could terminate his employment. He argues that he believed he was working for Industrial and that he believed Industrial was an independent maintenance contractor. Gaut's statement of his understanding of the situation is supported by the evidence, from which a jury could conclude, from all appearances, that Industrial was an independent contractor performing maintenance and other *Page 366 
services. If a jury finds that a reasonable person in Gaut's position could have concluded that Industrial was an independent contractor performing maintenance services for Holnam as the premises owner, the jury could find that Gaut did not impliedly consent to a contract of hire with Holnam.
Terry v. Read Steel, supra, and three of the cases following it have involved general employers that were unambiguously temporary employment placement agencies. Terry and Pettaway were placed with their special employers by Manpower, Inc.; Marlow, by Kelly Services, Inc.; and Means, by Long's Temporary Services, Inc. In such cases, the employee applies to the general employer for the specific purpose of temporary placement with special employers and thus necessarily agrees to a contract of hire with the special employer. For example, the Court in Pettaway, supra, stated: "Approximately two weeks before his injury, Manpower informed Pettaway of an available work assignment at Mobile Paint. Manpower asked Pettaway if hewould accept such an assignment, as this was the normalprocedure. Pettaway agreed to do so." 467 So.2d at 228 (emphasis added).
In Bechtel v. Crown Central Petroleum Corp., 495 So.2d 1052,1054 (Ala. 1986), Pep Services, Inc., had "agreed to supply Crown with gasoline filling station personnel." The opinion does not discuss how Bechtel started working with Pep or with Crown, but it recites the following facts in rejecting Bechtel's argument that she had not consented to a contract of hire with Crown:
 "Bechtel submitted to the control and supervision of a Crown employee, Steve Thornton; Bechtel wore uniforms supplied by Crown, bearing Crown labels; Crown participated in the hiring process; the service station manager (a Crown employee) would sign the weekly time sheets and had authority to transfer Bechtel to another station or to terminate her. This is clearly evidence that Bechtel submitted to employment with Crown, as a special employer, and, therefore, entered into a contract of hire with Crown."
Id. The Court stated that there was no evidence in the record that Bechtel had not consented to a contract of hire with Crown, and it affirmed the summary judgment for Crown.
Gaut did not wear Holnam clothing, but did wear a hardhat bearing Industrial's name; Holnam did not participate in the hiring process; Industrial supplied Gaut's tools; and Industrial, not Holnam, handled the administrative details of his employment. From the evidence cited in Bechtel, it appears that Pep Services was simply and obviously a placement agency, like Manpower and Kelly Services. Certainly Pep did not have supervisory personnel at the Crown station, as Industrial did in the Holnam plant.
Gaut also asserts that he could not be terminated by Holnam. There is evidence indicating that Gaut could be terminated by Holnam, although the contract is silent on this point. Morris Jessup, a process control superintendent at Holnam, testified that Holnam had the right to terminate any laborer who was not performing satisfactorily. This testimony is buttressed by the affidavit of Terry Holsonback, the president of Industrial. Holsonback stated that Holnam supervisors had the authority to replace any laborer whose work displeased the supervisor. However, it is not clear that an Industrial laborer who was "replaced" by a Holnam supervisor would automatically be fired by Industrial, or whether Industrial would make that decision itself and perhaps transfer him instead.
Gaut admitted he realized that he was supposed to follow the orders of Holnam's supervisors while performing the maintenance work at the plant. In his deposition, Gaut stated:
 "Well, if [a Holnam] — if it were [a Holnam] man, [a Holnam] foreman here and an Industrial foreman here, and they told me what to do, I would do what the [Holnam] man told me to do. So there were some circumstances where [a Holnam] man and an Industrial man — like, an Industrial man would tell me to do something, and [a Holnam] person would tell me to do something. I'd do what the [Holnam] person told me to do." *Page 367 
However, this is not necessarily unlike the situation where an employee of an independent contractor knows that the premises owner has the ultimate authority on the site, i.e., has reserved the right to control the details of the work.
Pinson v. Alabama Power Co., 557 So.2d 1236 (Ala. 1990), could be read as holding that such an acknowledgment of ultimate authority is dispositive of the question of an implied contract of hire. In Pinson, this Court held that the plaintiff had formed an implied contract of hire with the special employer, Alabama Power Company ("APCo"), citing the facts that Pinson "understood that APCo was 'the boss' of the project and he submitted to APCo's control and supervision." 557 So.2d at 1237. However, those facts were only the conclusion of the following list:
 "Under the contract, APCo retained the right to participate with Ellard in the hiring of the workers; to require the dismissal of workers under certain circumstances; and to supervise and control the manner or methods of work performed by the workers. APCo prepared and maintained the payroll time records, calculated the amount of wages that became due and the deductions that had to be made therefrom, and deposited the necessary funds into a special Ellard bank account from which Ellard made withdrawals to meet its payroll. The bank at which Ellard's payroll account was opened had to be approved by APCo. APCo also provided the workers with tools and equipment and directly procured, and paid the premiums for, their workmen's compensation insurance."
Id., at 1236-37. Pinson is thus distinguishable from this case because of the much more pervasive involvement of Alabama Power in Pinson's hiring and in the details of his employment and because of the absence of evidence that Pinson's general employer appeared to be operating on the site as an independent contractor rather than as a mere supplier of labor.
Both Pinson and Rhodes, supra, involved general employers unlike the temporary employment placement agencies involved inTerry, Pettaway, Marlow, and Means. The Court in Rhodes
referred to the general employer as "a contractor that had served as a labor broker for Alabama Power since 1974, primarily for the provision of laborers to perform construction services at Alabama Power's J.H. Miller, Jr., Steam Plant in Jefferson County." 599 So.2d at 27. Rhodes did not dispute the first two elements of the "special employer" test; rather, he argued only that Alabama Power did not have the right to control the details of his work.
"Labor brokers" as involved in Pinson, Rhodes, perhapsBechtel, and arguably here, are different from "temp" agencies, and it may or may not be obvious to an employee that the nature of his employment with one employer is such that he is impliedly agreeing to a contract of hire with another entity operating as a "special employer."
An important consideration in this inquiry is stated inVanterpool v. Hess Oil V.I. Corp., 766 F.2d 117, 122 (3d Cir. 1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 801,88 L.Ed.2d 777 (1986). That court looked to "whether the employment with the borrowing employer was of such duration that the employee could be reasonably presumed to have evaluated and acquiesced in the risks of his employment." Gaut reported to the Holnam plant every work day of the seven-week period. He was aware that this was his ordinary workplace and that he was expected to follow the orders of the Holnam supervisors. Moreover, Industrial had supplied Holnam's maintenance crews since 1983: therefore, this is not a case of an employee's being lent to another employer for a very short time or being lent on an ad hoc basis and thus having little or no reason to actually consent to a contract of hire with the borrowing employer. However, these considerations are not so important as to support a holding that Gaut must be deemed as a matter of law to have entered into an implied contract of hire with Holnam.
Gaut submitted substantial evidence that Industrial presented itself to him as an independent contractor performing maintenance services and that Holnam either reinforced this appearance or did nothing to contradict it. He may have reasonably viewed Holnam simply as a premises owner that had reserved a right to control its contractor's *Page 368 
performance. See, e.g., Thomas v. Pepper Southern Constr.,Inc., 585 So.2d 882 (Ala. 1991); Pugh v. Butler Telephone Co.,512 So.2d 1317 (Ala. 1987); Alabama Power Co. v. Beam,472 So.2d 619 (Ala. 1985). If a jury so finds, it could also find that Gaut did not enter into an implied contract of hire with Holnam.[5] In short, there is a point at which an entity that the contracting parties attempt to cast as a general employer assumes such duties as to become an independent contractor for provision of services, not just laborers, and at that point its employees do not impliedly contract with the "special employer." This case presents a fact question as to whether Industrial had reached that point.
For the foregoing reasons, the judgment is reversed, and the cause is remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, ADAMS and INGRAM, JJ., concur.
[1] Gaut does not argue any separate issue as to Medrano, Holnam's mill supervisor. If Gaut was an employee of Holnam for workers' compensation purposes, then he could bring an action against Medrano, who would be his co-employee, only for "willful conduct," which he does not allege. Ala. Code 1975, § 25-5-11. Thus, the judgment for Medrano stands or falls with the judgment for Holnam.
[2] This contract was a renewal of similar contracts beginning in 1983. Industrial also agreed to provide laborers for purposes other than maintenance.
[3] For example, the wage rate for a laborer pursuant to the agreement was $7.90 per hour. Industrial, in turn, paid its laborers only $5.00 per hour, and the remaining $2.90 was allocated to the various other components.
[4] Section 25-5-1(4) defines "employer" as "Every person who employs another to perform a service for hire and pays wages directly to the person." None of the cases has considered the significance for this definition of the fact that the employee's wages were channeled through the general employer, and Gaut does not argue that Holnam was not his employer because it did not "pay wages directly to" him. We think this definition is satisfied by arrangements, such as the one between Industrial and Holnam, where the employee's wages are directly correlated to the hours worked for the special employer and directly attributed to payments from the special to the general employer.
[5] We note that the result here is consistent with the recent case of Hicks v. Alabama Power Co., 623 So.2d 1050 (Ala. 1993).