THOMPSON, Judge.
The estate of Paul A. Jourdan, Jr., deceased, by and through its administrator, Paul A. Jourdan, Sr. (hereinafter “the estate”), sued Innisfree Corporation; Innis-free Hotels, Inc.; Redmont Hospitality, Ltd. (“Redmont”); Total Assurance Security and Patrol (“TASP”); and several fictitiously named defendants, seeking workers’ compensation benefits for the dependent of Paul A. Jourdan, Jr. (“Jour-dan”), who was murdered during the course of his employment. The estate later amended its complaint to identify two of the fictitiously named defendants as Talmadge A. Worchester, individually and d/b/a TASP, and Geri Tanner, individually and d/b/a Dixie K-9.[1]
Innisfree Corporation (hereinafter “In-nisfree”) and Redmont moved for a summary judgment. On March 14, 2002, the trial court entered an order denying that motion and dismissing the estate’s claims against Tanner both in her individual capacity and doing business as Dixie K-9.
On June 26, 2002, the trial court conducted an ore tenus hearing. On September 12, 2002, the trial court entered a judgment in which it found Jourdan had been an employee of Innisfree; that Jour-dan’s brother, Raymond Jourdan (“Raymond”), was Jourdan’s dependent; and that Raymond was entitled to the statutory maximum of 500 weeks of workers’ compensation benefits pursuant to § 25-5-60, Ala.Code 1975. In that judgment and in a later order entered pursuant to Rule 60(a), Ala. R. Civ. P., the trial court dismissed the estate’s claims against all of the other remaining defendants. Innisfree timely appealed; the estate did not appeal the dismissal of its claims against the other defendants.
In February 1997, Innisfree managed the Holiday Inn-Redmont hotel (“the hotel”) on behalf of its owner, Redmont. Harlan Butler, the executive vice president of Innisfree, testified that Innisfree had entered into an agreement with TASP pursuant to which TASP was to provide security services for the hotel between the hours of 11:00 p.m. and 7:00 a.m.
Butler testified that the duties of the security personnel provided by TASP were established in an agreement the hotel reached with TASP before Jourdan began working at the hotel. Butler listed the duties the security personnel provided by TASP as follows: to stand inside the hotel *350 lobby; to be a visible security presence in the hotel; to escort employees and customers to the parking garage; to deal with unruly customers; to drive the hotel van to transfer airline employees between the airport and the hotel; and to drive the hotel van to pick up the hotel’s breakfast cook each morning and take her to work at the hotel. Butler testified that a person working at the hotel’s front desk generally instructed the security person on duty when a customer or employee needed an escort to the parking garage, when the hotel needed the security person to deal with an unruly customer, and what time to go to the airport. Butler stated that before 11:00 p.m., a hotel bellman usually performed some of those services, such as escorting patrons or employees to the parking garage, that were performed by the security personnel after 11:00 p.m.
Butler testified that Innisfree did not have the authority to discipline the security-service personnel sent to the hotel by TASP, nor could it terminate the security-service personnel. Butler also stated that Innisfree had no control over the scheduling of which nights a particular security-service person would work. Butler testified that if one of the security-service personnel could not work, that person telephoned TASP and not the hotel. Butler explained that it was TASP’s responsibility to provide a replacement security person to provide security services at the hotel in that event. Butler testified that the security personnel did not wear uniforms issued by the hotel, and that they wore either a security uniform or a blue police-officer-type uniform. Butler also testified that Innisfree did not maintain any personnel records, schedules, or payroll information for the security personnel and that the officers were paid by TASP.
Talmadge Worchester testified that he began doing business as Dixie K-9, providing security dogs for various businesses, but that by 1997, he was doing business as TASP; Worchester operated TASP as a security-service business. Worchester explained that TASP had contracts or agreements to provide security for several businesses, and that one of those businesses was the hotel. Other than Worchester, TASP had one full-time employee — a man named Walter who was called “Terry.” TASP assigned Terry to work at the hotel. Worchester testified that Terry hired his friend, Jourdan, to work for TASP so that Terry could have some evenings off. The record does not clearly indicate when Jourdan began working for TASP, but Worchester’s testimony indicates that Jourdan had been working for TASP for only a few months before he was killed.
Worchester testified that Jourdan had a full-time job as a security guard at a local greyhound racetrack, and that Jourdan worked one night per week for TASP; TASP assigned Jourdan to work at the hotel. Worchester explained the duties the hotel had informed TASP it wanted its security personnel to perform between the hours of 11:00 p.m. and 7:00 a.m., as follows:
“From my understanding, all that they were supposed to do down there was to check the floors, make sure all rooms were closed and [that] there were no vagrants in the hallways or in the restrooms .... [t]hen, they were supposed to make coffee. And then, they were to take the airline [employees] to them terminal.... And on [the] return trip, [they] were to stop and pick up the cook and come back to the hotel.”
Worchester testified that the hotel did not issue Jourdan a uniform, but that the uniform Jourdan wore was the one he wore to his job at the racetrack. Wor-chester stated that Innisfree did not take part in hiring either Terry or Jourdan, and *351 that it did not have the authority to fire the security personnel. Worchester stated that at one time, the hotel had considered hiring its own in-house security staff, but that it ultimately decided not to do so. Worchester also testified that he was concerned about TASP’s liability if there was an accident while Terry or Jourdan was driving the hotel’s van, so the hotel manager agreed to “put a waiver in there that their insurance would cover” any liability in the event the security personnel were involved in an accident while driving the hotel’s van. It appears, but is not clear from the record, that the insurance policy Worchester referred to was provided by the hotel, i.e., Redmont.[2]
It is undisputed that the hotel paid TASP $6.10 per hour for the security services Jourdan provided, and that TASP paid Jourdan minimum wage and in cash. The record indicates that TASP has had some difficulties with the Internal Revenue Service, apparently because of its failure to pay corporate taxes, its failure to pay taxes on behalf of its employees, and its failure to provide the appropriate income-tax forms to its employees.
On February 7, 1997, Jourdan, who was providing security services for the hotel, was murdered after leaving the airport in the hotel van purportedly on the way to pick up the hotel’s breakfast cook. However, Jourdan was found dead in his home, and the hotel’s van was recovered a few days after the murder.
Raymond, Jourdan’s brother, testified that he had visited Jourdan seven to eight times while Jourdan worked at the hotel. Raymond testified that Jourdan did not wear a police-officer-type uniform while working at the hotel, but that Jourdan wore blue slacks and a tie when working at the hotel. Raymond also testified that Jourdan wore a hotel lapel pin when he was working at the hotel. Raymond testified that he had been present when a member of the hotel staff had asked Jour-dan to check on something occurring within the hotel. Raymond also stated that he had witnessed Jourdan greet hotel customers, and that on occasion he might “carry a briefcase or something for someone,” but that most of the time, the customers merely proceeded past Jourdan and went to the hotel desk counter. Raymond also testified regarding one occasion in which the hotel’s breakfast cook offered to provide both Jourdan and him breakfast; the estate had presented evidence that the hotel provided a daily breakfast to all of its employees.
The estate presented evidence, through Raymond’s testimony and the testimony of the brothers’ father, that Raymond and Jourdan lived together and, until mid-1996, each contributed to the shared household expenses. In mid-1996, Raymond lost his job. Raymond borrowed $15,000 from his parents in order to start his own business. He obtained his first business license in December 1996, and the final license in March 1997. From mid-1996 until his death, Jourdan paid all of his and Raymond’s household expenses. Raymond, who was 25 years old at the time Jourdan died, suffers from no physical or mental deficiencies that prevent him from seeking, obtaining, or maintaining gainful employment; Raymond testified that between mid-1996 and March 1997, he was attempting to start his own business.
Raymond started his own business in March 1997, the month after Jourdan died, and was still operating that business at the time of the hearing in this matter. However, the estate contended that because *352 Jourdan was paying most of the household expenses at the time of his death, pursuant to § 25-5-62, Ala.Code 1975, Raymond was totally dependent on Jourdan for his own support; on that basis, the estate sought workers’ compensation on Raymond’s behalf. The trial court determined that Raymond was entitled to workers’ compensation death benefits from Innis-free for 500 weeks, the maximum period of time allowed by statute. See § 25-5-60, Ala.Code 1975.
On appeal, Innisfree makes several arguments concerning the trial court’s determination that Raymond was Jourdan’s dependent. However, because Innisfree’s argument that the trial court erred in determining, based on the evidence presented to it, that Jourdan was its employee rather than an independent contractor employed by TASP, is dispositive of this appeal, we do not reach the other issues raised in Innisfree’s brief on appeal.
Benefits under the Workers’ Compensation Act are available only where the employer-employee relationship exists between the parties. See § 25-5-53, Ala.Code 1975 (the Workers’ Compensation Act provides an employee’s only remedy for injuries suffered on the job). “The exclusive remedy provision extends to ‘special employers,’ which have been described as ‘individuals or businesses who, for practical purposes, may be considered primary or co-employers of the injured employee.’ ” Gaut v. Medrano, 630 So.2d 362, 364 (Ala.1993) (quoting Rhodes v. Alabama Power Co., 599 So.2d 27, 28 (Ala.1992)). In reviewing a determination that a claimant is an employee or a special employee of the defendant, this court must conclude whether the trial court’s finding that an employer-employee relationship existed is supported by substantial evidence. “Substantial evidence” is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
Our supreme court has adopted the following test to determine whether a claimant is an employee or an independent contractor:
“ ‘When a general employer lends an employee to a special employer, the special employer becomes liable for [workers’] compensation only if
“ ‘(a) the employee has made a contract of hire, express or implied, with the special employer;
“ ‘(b) the work being done is essentially that of the special employer; and
“ ‘(c) the special employer has the right to control the details of the work.
“ When all three of the above conditions are satisfied in relation to both employers, both employers are liable for [workers’] compensation.... ’
“1C A. Larson, The Law of Workmen’s Compensation, § 48 (1980).”
Terry v. Read Steel Prods., 430 So.2d 862, 865 (Ala.1983). See also Rast Constr., Inc. v. Peters, 689 So.2d 781 (Ala.1996) (the three-part test set forth in Terry, supra, must be met by substantial evidence); Gaut v. Medrano, supra; Bechtel v. Crown Cent. Petroleum Corp., 495 So.2d 1052 (AIa.1986).
In finding that Jourdan was an employee of Innisfree, the trial court stated:
“This court, after further careful consideration, recognizes the factors presented by [Innisfree that] would otherwise support a finding that [Jourdan] was an employee of an independent contractor. Under what might be described as normal circumstances, [Innis- *353 free] would likely not have had a reserved right of control over [Jourdan]. However, in this case, Jourdan was not performing the normal duties of a security guard, but was instead engaged in the performance of those duties of a regular employee of [Innisfree], to include transportation of airline crews to and from the airport on behalf of the hotel. The Court further finds persuasive the evidence as submitted by deposition testimony [of Worchester] whereby [Jourdan] was recognized as an agent or employee of [Innisfree], such that liability insurance coverage was provided during his operation of [the hotel’s] vehicle. In addition, Jourdan was killed while engaged in a mission for [Innisfree] in picking up the hotel’s breakfast cook.
“For these and other reasons, it appears to this court that at the time of his death, Jourdan was acting as an employee of [Innisfree].”
Thus, it appears from the language of the judgment that the trial court considered the three elements of the test adopted in Terry for determining whether a worker was a special employee of a defendant.
Under that test, we must first determine whether Jourdan made a contract of hire, either express or implied, with Innisfree. Nothing in the record indicates that Jour-dan entered into an express contract of hire with Innisfree. Rather, the estate had proceeded under the theory that In-nisfree and Jourdan had an implied contract of hire.
In Terry v. Read Steel Products, supra, the trial court concluded that an employer-employee relationship existed between Read Steel and Rodney Terry, a worker who was employed by a temporary-service agency to work at Read Steel. In that case, our supreme court adopted the test set forth in Larson’s The Law of Workmen’s Compensation regarding when a special employer becomes liable as an employer for workers’ compensation benefits. It concluded that Terry had been engaged in doing Read Steel’s work, i.e., the work of the special employer, and that Read Steel had controlled the details of Terry’s work. The court then concluded that there was a contract of hire between Terry and Read Steel. 430 So.2d at 866. In Terry, however, although Terry was technically on the temporary-service agency’s payroll, Read Steel had actually hired Terry; Terry testified that he had not signed any documents at the temporary-service agency, and that he had never had any dealings with anyone at the temporary-service agency except picking up his pay-cheek.
Similarly, in Bechtel v. Croum Central Petroleum Corp., 495 So.2d 1052 (Ala.1986), our supreme court concluded that the worker, Bechtel, was an employee of the special employer, Crown. In that case, Bechtel was supervised by a Crown employee and wore a uniform issued by Crown; Crown participated in the hiring of Bechtel; and a Crown supervisor had the authority to transfer Bechtel or to terminate her employment. Our supreme court concluded that that evidence clearly indicated that Bechtel had submitted to an employer-employee relationship with Crown. 495 So.2d at 1054.
In Pinson v. Alabama Power Co., 557 So.2d 1236 (Ala.1990), the issue was whether the worker, Pinson, was an employee of Alabama Power (“APCo”). In that case, APCo entered into an agreement with a company known as Ellard, which agreed to provide APCo with workers and supervise the workers with regard to a particular project. APCo reserved the right to participate in hiring, to terminate the workers’ employment, and to supervise and control the manner in which the workers *354 performed their duties. APCo also maintained and calculated the payroll and each worker’s deductions, and it deposited money for the payroll into a special account for Ellard from which Ellard paid the workers. APCo had also required that it approve the bank in which Ellard opened that special account from which it would pay the workers. Our supreme court rejected Pinson’s argument that because El-lard supervised its workers on the project site, he was not an employee of AlPCo. The court concluded that “[t]he undisputed material facts in this case show, as a matter of law, an implied contract of employment between Pinson and APCo.” Pinson v. Alabama Power Co., 557 So.2d at 1238.
In this case, the evidence might support a finding that the second two elements of the test set forth in Terry have been met. However, we find the facts with regard to the first element of that test to be distinguishable from the facts pertaining to that element in the cases of Terry, Bechtel, and Pinson.
In Terry, Bechtel, and Pinson, the evidence demonstrated that the special employers each performed certain activities that would support an inference of an implied employment relationship. In those cases, the special employers took part in hiring or had the authority to terminate the worker’s employment, and, in the ease of Pinson, the special employer even maintained payroll records. In those cases, the courts concluded that an employer-employee relationship was implied under the particular facts of those cases; thus, the courts concluded that the first element of the test set forth in Larson’s The Law of Workmen’s Compensation and adopted in Terry was satisfied.
In this case, both Butler, the representative of Innisfree, and Worchester, the owner of TASP, testified regarding the duties the security personnel were to perform for the hotel and the hours in which those services were required. Butler and Wor-chester’s testimony regarding their understanding of the agreement between the hotel and TASP pertaining to the duties of the security personnel was virtually identical; it appears that, to some extent, hotel employees dictated the timing of when Jourdan or another security person was to perform those duties. It is undisputed that Innisfree did not maintain or calculate the payroll for Jourdan; that it did not pay taxes or for workers’ compensation coverage for Jourdan; that it did not participate in hiring Jourdan; and that it did not have the authority to discipline, transfer, or terminate Jourdan. Further, Innisfree had no authority to determine which security person was to work at the hotel at any particular time.
We note that in its judgment, the trial court cited the provision of insurance coverage for the security personnel when they drove the hotel van as a basis for concluding that Jourdan was an “agent” of Innisfree; the record contains no evidence regarding the nature of that insurance coverage or which entity provided that coverage. Therefore, even assuming that that insurance coverage could support an inference of an implied employer-employee relationship, the evidence does not establish that Innisfree, rather than the hotel, provided the insurance coverage for the security personnel.
After carefully reviewing the record on appeal, we conclude that the facts do not support a finding that Innisfree had an implied employer-employee relationship with Jourdan.
“This Court has held that in determining whether a special employment relationship exists ‘the most important criterion to be scrutinized is the requirement of a contract of hire, express or implied.’ Terry v. Read Steel Products, 430 So.2d *355 at 866. Indeed, ‘the courts have usually been vigilant in insisting upon a showing of deliberate and informed consent by the employee before [the] employment relation [may be established].’ 1C, A. Larson, Workmen’s Compensation Law, § 48.12, p. 8-400-8-445. A mutual agreement bettueen the employee and the person alleged or claiming to be the special employer, ie., a contract of hire, express or implied, is essential because an employee loses the right to sue the special employer at common law, while gaining other rights, when he or she enters into the special employment relationship. Id.”
Hicks v. Alabama Power Co., 628 So.2d 1050, 1053 (Ala.1993) (emphasis added).
Merely because a person employed by an independent contractor serves another employer at its command or direction, a new employment relationship is not necessarily created. Rast Constr., Inc. v. Peters, 689 So.2d 781 (Ala.1996). The evidence in this case does not demonstrate that Jourdan could be said to have accepted, even impliedly, a contract of hire with Innisfree. We conclude that the trial court erred in determining that Jourdan was an employee of Innisfree, and, therefore, that the estate or Raymond was entitled to benefits under the Workers’ Compensation Act. We must reverse the trial court’s award of workers’ compensation benefits.
Our holding that Jourdan was not a special employee of Innisfree is dispositive of this appeal. Therefore, we pretermit discussion of whether Raymond was Jour-dan’s dependent and whether he was entitled to the maximum amount of benefits authorized by the Workers’ Compensation Act.
REVERSED AND REMANDED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs specially.

. The record on appeal sometimes refers to this entity as “Dixie Canine.”

. Redmont, not Innisfree, paid the wages of and other expenses related to the hotel employees. It is undisputed that the security personnel were not on Redmont's payroll.