THOMPSON, Presiding Judge.
Casey E. Lewis appeals from a summary judgment entered by the Mobile Circuit Court in favor of Alabama Power Company (“APCo”) on claims of negligence and wantonness arising out of an accident Lewis suffered while working at an APCo plant. For the reasons stated herein, we reverse that judgment and remand the cause for further proceedings.
The evidence submitted in support of and in opposition to APCo’s summary-judgment motion, considered in the light most favorable to Lewis, see Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala.2000), reveals the following pertinent facts. Lewis is a boilermaker. At the time of his injuries made the basis of the present action, he was employed by Fluor Maintenance Services, Inc. (“Fluor”), at APCo’s Barry Steam Plant in Mobile County (“the plant”).
Although he was employed by Fluor, Lewis was working at the plant pursuant to a contract (“the labor broker agreement”) between Fluor and Southern Company Services, Inc. (“SCS”). Although it is a separate entity from APCo, SCS was performing construction services for APCo at the plant.[1] Pursuant to the labor broker agreement, Fluor was to provide to SCS temporary craft labor, foremen, and additional personnel for the performance of construction services at the plant, for which SCS was to pay Fluor on a per-person, hourly rate. The labor broker agreement provided that “[a]ll work and activities of the craft labor, foremen and supervisors and other personnel of [Fluor] at the Project shall be coordinated and scheduled by [SCS] and shall be performed under the direct supervision and control of [SCS].” The labor broker agreement required Fluor to procure workers’ compensation insurance for its employees at its expense, but the agreement also provided that the cost of that insurance would be included in the rate SCS paid to Fluor for the provision of labor. Although the labor broker agreement recited that it was entered into between Fluor and SCS, SCS purported to execute the agreement as an agent for APCo.
Lewis began working at the plant in November 2007. At the outset of his work at the plant, he signed a document titled “Project Security Rules for Labor Broker Employees” (“the project-rules document”). That document stated, among other things:
“I have received and read a copy of the Southern Company Services Project Security Rules for Labor Broker Em *562 ployees, and I understand that a violation of these rules may be followed by disciplinary action or dismissal by my employer (Fluor). I further understand that violators of these rules may be removed from the project and/or property and Southern Company Services may refuse to readmit them for extended periods of time.
“I further understand and acknowledge that while my wages, hours, and other terms and conditions of employment are set by my general employer, Fluor, and my union, if any, that my general employer serves only as a labor broker for Southern Company Services at this project and that my work will be subject to the direction, control, and the supervision of both Southern Company Services and my general employer while working on this project. I fully understand this and hereby give my express consent to this working relationship while I am employed at this project.”
Lewis signed this document on November 13, 2007.
In his deposition, Lewis stated that a Fluor employee conducted his orientation for the project and that his foreman at the project was also a Fluor employee. He stated that he worked the night shift and that, at the beginning of each of his shifts, his foreman conducted a safety meeting and gave Lewis his work instructions for the night. Regarding the involvement of SCS or APCo in the work that was being performed, Lewis testified as follows:
“Q. [By counsel for APCo:] Now did you see the Southern Company Services, Alabama Power Company people there on that night shift?
“A. Wendell, think what they called the coordinator, he was up there talking with Lou Lou and different foremen and stuff.
“Q. Wendell?
“A. I believe that was his name.
“Q. Wendell. Did he have one of those white hard hats on?
“A. Yes, sir.
“Q. With the Power Company logo on it?
“A. Yes, sir.
“Q. And he was talking to who now?
“A. The foremen, Lou Lou, the coordinator.
[[Image here]]
“Q. And what about Mr. Stokes[, a Fluor employee], was he in on some of these conferences or meetings?
“A. I don’t know if they were meetings. “Q. Just talking about what’s going to be done?
“A. I guess that’s what they talked about. I really don’t know.
“Q. Generally when you would see them talking together, would you right after that get your work instructions for that shift?
“A. No.”
The following exchange also occurred during Lewis’s deposition:
“Q. [By counsel for APCo:] Did you see — now you know what Southern Company Services is, you know who that is?
“A. Alabama Power.
“Q. Southern Company Services and Alabama Power mean one [and] the same thing to you?
“A. To me they are, yes.”
On January 31, 2008, Lewis was injured while working at the plant. He was detaching a large steel plate from some duct-work. The steel plate was attached to two “air tuggers” that, when activated, would lift or lower the steel plate depending on which of two handles was pulled. After Lewis cut the plate from the ductwork, he *563 attempted to lift the plate with the air tuggers. When the plate did not move, he stepped onto the steel plate to determine why the plate was not detaching from the ductwork. While he was standing on the plate, it became dislodged and he and the plate were propelled into the air, causing injuries to Lewis, including fractures in his scapula and his forearm and burns and cuts on his back. Lewis received medical treatment for his injuries. He did not return to work at the plant.
On March 6, 2008, Lewis filed an action against Fluor,[2] Tool-Smith Company, Inc. (“Tool-Smith”), and The Southern Company. In his complaint, he alleged that he had been injured during the course of his employment with Fluor. He asserted that the air tugger he was using at the time he was injured had become stuck in the “on” position, causing the steel plate to be propelled upward and causing his injuries. Lewis alleged that the air tugger had been owned, provided, repaired, or maintained by Tool-Smith and The Southern Company. He sought benefits pursuant to the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975 (“the Act”), against Fluor. He sought an award of damages against Tool-Smith and The Southern Company for what he alleged was their negligence and wantonness in failing to maintain the air tugger in a safe condition by failing to install, maintain, or repair the switch or other device that operated the air tugger.
By stipulation, The Southern Company was dismissed from the action. Subsequently, in an amended complaint, Lewis named APCo as a defendant, stating the same allegations against APCo as he had against The Southern Company. Lewis reached a settlement with Fluor as to his workers’ compensation claims, and, on May 5, 2009, the trial court entered an order approving that settlement.
On September 17, 2010, APCo filed a motion for a summary judgment. APCo argued that it was a “special employer” of Lewis and, as a result, that Lewis’s exclusive remedy against it was for benefits under the Act. See Rhodes v. Alabama Power Co., 599 So.2d 27, 28 (Ala.1992) (“The ‘exclusive remedy provision of the Alabama Workmen’s Compensation Act has been extended to include ‘special employers,’ described as ‘individuals or businesses who, for practical purposes, may be considered primary or co-employers of the injured employee.’ ” (quoting Tweedy v. Tennessee Valley Auth., 882 F.2d 477, 479 (11th Cir.1989))).
APCo submitted with its summary-judgment motion the affidavit of an SCS employee who served as a construction manager at the plant. In his affidavit, the SCS manager stated that, while performing construction services at the plant, SCS acted as APCo’s agent; that SCS “passes through its costs of performing its agency functions to APCo”; and that “APCo is responsible for any liabilities SCS incurs in the performance of its agency obligations.” The manager further stated, in pertinent part:
“4. While SCS was the named party (as APCo’s agent) and administrated the Labor Broker Agreement, the Agreement was carried out and enforced by APCo....
“5. In carrying out and enforcing the Labor Broker Agreement, APCo arranged for worker’s compensation insurance coverage for the Fluor personnel by requiring Fluor to procure and maintain that insurance. APCo paid for the cost of that insurance by including that *564 cost in the rate paid to Fluor for its personnel....
“6. APCo paid a weekly sum to Fluor for the furnishing of the personnel.... APCo also kept up with the hours of the Fluor personnel and arranged for and reimbursed Fluor for the paychecks issued to those employees.
“7. Under the Labor Broker Agreement, APCo had the right to control and to supervise the details of the work performed by the Fluor personnel. In addition, APCo had the right to deny Fluor personnel readmission to the work at Barry Steam Plant....”
Lewis filed a response in which he disputed APCo’s characterization of itself as his special employer as well as its assertion of immunity to tort liability arising from that characterization. Among other things, Lewis argued that SCS, not APCo, was the entity with which Fluor had contracted to provide labor; that the labor broker agreement indicated that SCS, not APCo, would exercise control over the work to be performed by Fluor personnel; that the project-rules document provided for control and supervision by SCS, not by APCo; and that Lewis had testified that he took his work instructions from other Fluor personnel, not from APCo or SCS employees. Thus, he argued, there existed, at the very least, a question of fact as to whether Lewis had accepted APCo as his special employer, and, he asserted, as a result APCo was not entitled to a summary judgment.
On December 10, 2010, the trial court granted APCo’s motion and entered a summary judgment in its favor. Subsequently, the trial court denied a summary-judgment motion that Tool-Smith had filed, and it entered an order making its summary judgment in favor of APCo a final judgment pursuant to Rule 54(b), Ala. R. Civ. P. Lewis filed an appeal to our supreme court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
In Gaut v. Medrano, 630 So.2d 362 (Ala.1993), our supreme court set forth the legal principles, as well as the appropriate standard of review, relative to the entry of a summary judgment based on the special-employer doctrine:
“Alabama Code 1975, § 25-5-53, provides that an action brought under the Workers’ Compensation Act is the exclusive remedy for an employee’s injuries sustained in the course of his employment. Rhodes v. Alabama Power Co., 599 So.2d 27 (Ala.1992). The exclusivity bar is an affirmative defense. Rule 8(c), Ala. R. Civ. P. Therefore, on a motion for summary judgment, the defendants have the burden of establishing a prima facie showing as to each element of the defense of exclusivity; if the defendants are able to carry this burden, then the plaintiff must present substantial evidence to overcome this prima facie case. A[la], R. Civ. P. 56; Ala.Code 1975, § 12-21-12. Substantial evidence has been defined as ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Also, in reviewing a summary judgment, we must resolve all reasonable doubts in favor of the non-movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).
“The exclusive remedy provision extends to ‘special employers,’ which have been described as ‘individuals or businesses who, for practical purposes, may be considered primary or co-employers of the injured employee.’ Rhodes, supra, at 28 (quoting Tweedy v. Tennessee Valley Authority, 882 F.2d 477, 479 *565 (11th Cir.1989)). In Terry v. Read Steel Products, 430 So.2d 862 (Ala.1983), this Court adopted a three-pronged test for determining when an employee of a general employer can become the employee of a ‘special employer’ for purposes of workers’ compensation:
“ ‘ “When a general employer lends an employee to a special employer, the special employer becomes liable for workmens’ compensation [and thus immune from liability for tort actions brought by the special employee] only if
“ ‘ “(a) the employee has made a contract of hire, express or implied, with the special employer;
“ ‘ “(b) the work being done is essentially that of the special employer; and
“‘“(c) the special employer has the right to control the details of the work.
“ ‘ “When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmens’ compensation.” ’
“430 So.2d at 865 (quoting 1C A. Larson, The Law of Workmen’s Compensation, § 48 (1980)). The requirement of a contract of hire comports directly with our Workers’ Compensation Act, which defines an ‘employee’ as a ‘person in the service of another under any contract of hire, express or implied, oral or written.’ Ala.Code 1975, § 25-5-1(5).”
630 So.2d at 364 (footnote omitted).
Lewis contends that there is a question of fact with regard to the first element of the special-employer doctrine, i.e., whether he entered into a contract of employment, expressed or implied, with APCo. He argues, among other things, that he never consented to enter into a contract of employment with APCo, either expressly or impliedly, and that the evidence demonstrates, at most, that he had entered into a contract of employment with SCS, a company that is separate and distinct from APCo.
In Gaut, our supreme court stated that whether a worker has entered into an expressed or implied contract of employment with a purported special employer
“is an important determination, for when a person enters into an employer-employee relationship with a party, that person gives up valuable rights, including the common law right to bring an action against the party for any injury he might suffer while acting in the scope of his employment. Professor Larson makes this point in his treatise:
“ ‘Although the lent-servant doctrine is a familiar one at common law, and has produced some of the most venerable and most intricate cases in the law of master and servant, it is necessary to stress once more that the workmen’s compensation lent-employee problem is different in one significant respect: There can be no compensation liability in the absence of a contract of hire between the employee and the borrowing employer. For vicarious liability purposes, the spotlight was entirely on the two employers and what they agreed, how they divided control, how they shared payment, and whose work, as between themselves, was being done. No one paid much attention to the employee or cared whether he had consented to the transfer of his allegiance, since, after all, his rights were not usually as a practical matter involved in the suit. In compensation law, the spotlight must now be turned upon the employee, for the first question of all is: Did he make a contract of hire with the *566 special employer? If this question cannot be answered “yes,” the investigation is closed, and there is no need to go on into tests of relative control and the like.
“ ‘This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit.’
“[1C A.] Larson, [The Law of Workmen’s Compensation ] §§ 48.11 and 48.12 [ (1980) ].”
Gaut, 630 So.2d at 365 (emphasis added).
In the present case, we conclude that APCo failed to present substantial evidence demonstrating that Lewis entered into an express contract of hire with it. The only document Lewis signed consenting to control by any entity other than his employer, Fluor, was the project-rules document. As previously noted, that document provided that Lewis consented that the work he did on the project at the plant would “be subject to the direction, control, and the supervision of’ SCS and Fluor. APCo is mentioned in that document only once, in a section providing that the possession of cellular telephones and cameras was prohibited without the permission of APCo’s authorized representative.
APCo argues that the project-rules document constitutes an express contract of hire between Lewis and APCo because SCS acted as its agent on the project and because Lewis considered APCo and SCS to be the same entity. However, although it may very well be that SCS acted as APCo’s agent when performing construction services for APCo at the plant, the relevant question in the present case is whether there was deliberate and informed consent on the part of Lewis to enter into a contract of employment with APCo. Without a showing that Lewis knew SCS was acting on behalf of APCo as its agent and that Lewis knew that, by signing the project-rules document, he was entering into a contract of employment with APCo rather than SCS, it cannot be said that Lewis deliberately consented to an employment relationship with APCo.
Lewis’s deposition testimony indicating that he thought SCS and APCo were the same entity is not dispositive of the express-contract issue. We find that testimony, quoted above, to be ambiguous. That, at the time of Lewis’s deposition, SCS and APCo “mean[t] one [and] the same thing” to him does not mean that he had that same belief during the time he worked on the project at the plant. For purposes of determining whether Lewis knowingly consented to an employment relationship with APCo, it is the latter period, not the former, that is relevant. Furthermore, a fact-finder could conclude that, by that testimony, Lewis meant that APCo and SCS were closely related entities, not that they were incapable of having different employees serving interests other than those common to the two companies. Thus, Lewis’s testimony does not require a judgment as a matter of law in APCo’s favor as to the express-contract issue.
Because we conclude that, under the evidence presented by the parties, the summary judgment could not be predicated on a finding that Lewis had entered into an express employment contract with APCo, we turn to the question of whether Lewis’s consent to employment by APCo could be implied from the evidence. In *567 determining whether an implied contract of employment exists, courts will look at a number of factors, including whether the employee submitted to the control and supervision of the special employer, see Pinson v. Alabama Power Co., 557 So.2d 1236, 1238 (Ala.1990); whether the general employer was acting as a labor broker or a temporary employment agency for the special employer, see Hicks v. Alabama Power Co., 623 So.2d 1050, 1054-55 (Ala.1993); which entity provided the workers’ compensation insurance, see Pinson, 557 So.2d at 1238; and “ ‘ “whether the employment with the borrowing employer was of such duration that the employee could be reasonably presumed to have evaluated and acquiesced in the risks of his employment,” ’ ” G.UB.MK Constructors v. Garner, 44 So.3d 479, 488 (Ala.2010) (quoting Gaut, 630 So.2d at 367, quoting in turn Vanterpool v. Hess Oil V.I. Corp., 766 F.2d 117, 122 (3d Cir.1985)). Our review of these factors leads us to conclude that a question of fact exists as to whether Lewis impliedly consented to the formation of an employment contract between APCo and him.
As to whether Lewis submitted to the control of APCo, we note that, in the project-rules document, Lewis agreed that his work would be subject to the direction, control, and supervision of SCS, not APCo. Furthermore, Lewis testified that he received his daily work instructions from another Fluor employee, not from an APCo employee. We note that Lewis’s testimony regarding from whom his foreman received work instructions was vague, both with regard to who was giving those instructions and with regard to the extent to which those instructions were given. At no point did Lewis specifically testify, however, that he knew that the work instructions he was receiving originated with an employee of APCo rather than an employee of SCS or Fluor.
The next factor, whether the general employer was simply supplying labor for the special employer, is likewise not dis-positive of the issue of implied consent. The labor broker agreement provided that Fluor was to provide laborers to SCS; there is no mention of the provision of laborers by Fluor to APCo. Although we note the affidavit testimony of SCS’s employee to the effect that SCS acted on behalf of APCo in all facets of carrying out the labor broker agreement, the fact remains that, unlike in other employment-agency and labor-broker cases, where the labor is provided directly to the special employer in such a manner as to bring home to the employee the fact that he or she is working directly for the special employer, see, e.g., Bechtel v. Crown Central Petroleum Corp., 495 So.2d 1052 (Ala.1986), the evidence presented in support of the summary-judgment motion in the present case, including the labor broker agreement and the project-rules document, do not demonstrate that Lewis was made aware that he was being provided by Fluor to APCo rather than to SCS.
As for the next factor, the evidence the parties submitted reflects that APCo was only indirectly involved in the provision of workers’ compensation insurance covering Lewis during his employment at the plant. The labor broker agreement required Fluor to procure, at its own expense, workers’ compensation insurance for its employees. A separate part of the agreement, however, provided that the rate that SCS would pay to Fluor for the labor it provided, which was a fixed amount, included the cost of all insurance Fluor was required to procure under the agreement, including workers’ compensation insurance. The affidavit of the SCS manager that APCo provided in support of its summary-judgment motion indicated that APCo reimbursed SCS for all expenses it *568 incurred under the labor broker agreement. Thus, technically, it can be said that APCo provided workers’ compensation insurance covering Lewis, although somewhat indirectly.
The final factor, whether Lewis’s “employment with the borrowing employer was of such duration” that Lewis “could be reasonably presumed to have evaluated and acquiesced in the risks of his employment,” does not compel a finding as a matter of law that Lewis impliedly consented to a contract of employment with APCo. Under these circumstances, the duration itself, three months, does not, standing alone, lead to the conclusion that Lewis had to have known he was working for and employed by APCo. Although that amount of time probably was sufficient for Lewis to understand the risks involved in the work he was performing, that understanding would not, under the circumstances of this case, necessarily lead him to associate those risks with employment by APCo, rather than SCS or Fluor.
Having reviewed the above-noted factors, we conclude that there are genuine issues of material fact regarding whether Lewis entered into an implied contract of employment with APCo. Because we have also concluded that, at the very least, there were genuine issues of material fact regarding whether Lewis expressly consented to a contract of employment with APCo, APCo was not entitled to a summary judgment on its affirmative defense based on the “special employer” doctrine.[3] As a result, the trial court’s judgment is reversed and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
THOMAS, J., concurs.
MOORE, J., concurs in the result, without writing.
BRYAN, J., dissents, with writing, which PITTMAN, J., joins.

. An affidavit submitted by APCo in support of its summary-judgment motion described SCS as follows:
"[SCS] is a 'centralized service company’ of The Southern Company ... that provides a variety of services to other Southern Company subsidiaries, including [APCo], at cost and upon request. Such services include accounting, engineering, marketing, data processing, contract administration, human resources, insurance and other services with respect to their business and operations. In so doing, SCS always acts as agent for the client corporate affiliate, which in this case was [APCo]. With regard to [APCo]'s Barry Steam Plant in Bucks, Alabama, the scope of this relationship included construction services for [APCo].”

. Lewis originally named Fluor as "Fluor Daniel Services Corporation.” He later amended the name of Fluor to "Fluor Maintenance Services, Inc.”

. By so concluding, we need not consider Lewis’s other arguments for reversal.