WOODALL, Justice.
 

 G.UB.MK Constructors (“GUBMK”) and its former employee, Eric M. Leslie, appeal from a judgment entered on a jury verdict in favor of Wendell Garner, an employee of the Tennessee Valley Authority (“TVA”), in Garner’s action against them for on-the-job injuries Garner received when Leslie inadvertently drove a TVA-owned vehicle over Garner’s legs.
 
 [1]
 
 We reverse and remand.
 

 The details of the accident in which Garner was injured are largely immaterial to this appeal. What is material is the nature of the relationship between Leslie and TVA. In particular, this ease turns on whether Leslie was a “special employee” of TVA at the time of the accident. If so, then he was Garner’s co-employee for purposes of the Alabama Workers’ Compensation Act, Ala.Code 1975, § 25-5-1 et seq. (“the Act”), and he is entitled to the limited co-employee immunity provided under the Act.
 

 I. Facts Relating to the Employment Relationship
 

 GUBMK is a joint venture composed of three companies. It was formed in 1991 at the instance of TVA in order — as stated in “Tennessee Valley Authority and G.UB.MK Constructors Agreement No. 99MJ-232187, [June 28, 1999]” (“the contract”) — to partner with TVA “for the performance of modifications and supplemental maintenance work at TVA fossil and hydro plants and possibly at other TVA-controlled facilities.” According to the contract, GUBMK’s “principal work [is to] employ and manage all craft labor necessary for the completion of modification and supplemental maintenance work including construction, rehabilitation, modification, removal, replacement, and construction testing of components and/or systems identified by TVA at Fossil and Hydro generating plants and other sites ... within the TVA region.”
 

 The contract also provided, in pertinent part:
 

 “GC-3 SCOPE OF WORK INCLUDING SERVICES AND FACILITIES TO BE PROVIDED BY [GUBMK]
 

 “... [GUBMK] will perform a variety of functions, including, without limitation, site engineering, project management, inspection and testing services, craft training, administration of subcontractors and TVA’s other contractors, and some procurement-related activities. [GUBMK] may also furnish support personnel to provide a wide variety of services to augment TVA’s staff.
 

 [[Image here]]
 

 
 *482
 
 “GC-5 SERVICES, EQUIPMENT, MATERIALS, AND FACILITIES TO BE PROVIDED BY TVA
 

 [[Image here]]
 

 “4. Unless specified to the contrary-in a specific Project Authorization, TVA will furnish small tools and equipment and all large construction equipment, including cranes, loaders, large trucks, cherry pickers, hoists, etc., to [GUBMK].
 

 [[Image here]]
 

 “GC-9 INDEPENDENT CONTRACTOR
 

 “[GUBMK] represents that it is fully experienced and properly qualified, registered, licensed, equipped, organized, and financed to perform the work under [the contract], [GUBMK] agrees to act as an independent contractor and not as the agent of TVA, except in the circumstances referred to below, in completing [the contract] and maintaining complete control over its employees and all of its subcontractors.... [GUBMK] shall perform its work hereunder in accordance with its own methods subject to compliance with [the contract].
 

 [[Image here]]
 

 “GC-14 QUALIFICATION OF [GUBMK’S] AND SUBCONTRACTORS’ PERSONNEL
 

 “[GUBMK] shall employ only competent, qualified, and trained personnel to perform the work. In accordance with procedures to be mutually agreed upon, [GUBMK] shall remove from the job site any personnel of [GUBMK] determined to be unfit for performance of his or her assigned duties or to be acting or working in violation of job site work rules.
 

 [[Image here]]
 

 “GC-15 SUPPORT PERSONNEL (CRAFT/STAFF AUGMENTATION)
 

 “During the life of [the contract] TVA may request, and [GUBMK] agrees to provide when so requested, qualified support personnel in order to perform a broad range of staff augmentation functions such as general construction and field construction engineering services in accordance with criteria, procedures, and scheduling requirements established by TVA. With respect to craft labor, [GUBMK] agrees to provide support craft personnel as requested by TVA and authorized by the Technical Contract Representative. [GUBMK] shall inform all assigned support personnel of and be responsible for compliance with the requirements of the GC-15 and other applicable requirements. TVA will advise [GUBMK]-furnished support personnel of TVA’s specific rules, regulations, and safety procedures that will apply to the personnel’s specific work activities as determined by TVA.
 

 “All work activities of [GUBMK]-fur-nished support personnel shall be performed under the direction, supervision, and control of TVA, and TVA shall be responsible for requests and directions issued by employees of TVA to [GUBMK’s] ... employees providing support services to TVA hereunder. However, [GUBMK’s] employees providing support services to TVA hereunder shall continue as [GUBMK’s] ... employees, ... and shall not become employees of TVA. [GUBMK] ..., who is the employer, shall be responsible for the payment of the employees’ salaries and wages, payroll taxes, and employee benefits....
 

 [[Image here]]
 

 “GUBMK]-furnished support personnel shall provide support services pursuant
 
 *483
 
 to the direction, supervision, and control of TVA. Because [GUBMK’s] ... support personnel will work under the direct supervision and control of TVA, [GUBMK] does not warrant the quality of the services performed or the results obtained.
 
 TVA shall be solely responsible for the acts or omissions of such personnel during the assignment of such personnel to TVA and within the scope of their TVA-assigned deities,
 
 provided that nothing herein shall create or confer any rights upon third parties.
 

 [[Image here]]
 

 “TVA shall have the right to reject any assigned support personnel considered by TVA, at any time, in its sole discretion, not to be acceptable or qualified to perform the assigned work.
 

 [[Image here]]
 

 “GC-22 INDEMNITY
 

 “Subject to the provisions of GC-9,
 
 [GUBMK] shall be an independent contractor for all purposes of this [contract], and all persons engaged in carrying out any of [GUBMK’s] obligations hereunder shall be the servants of [GUBMK] ... and not the servants or agents of TVA.
 

 [[Image here]]
 

 “GC^9 LABOR AGREEMENTS
 

 “Included herein as Attachment 10 is the TVA PMMA [Project Maintenance and Modifications Agreement for the Tennessee Valley Authority Including Hourly Rates of Pay and Fringe Benefits for Maintenance and Modifications Work Performed Under Contract] and [as] Attachment 11 is the CPA [Construction Project Agreement (Including Office Construction, Maintenance, and Modification Supplement to the Construction Project Agreement) for the Tennessee Valley Authority Including Hourly Rates of Pay and Fringe Benefits for Construction Work Performed under Contract] (hereinafter collectively ‘Labor Agreements’). The Labor Agreements, among other things, set out requirements covering the rates of pay, hours of work, and conditions of employment for employees, as the term ‘employee’ is defined in subsection GC-49.1 below, Labor Agreements Provisions.
 
 [GUBMK] shall become signatory to the Labor Agreements and shall accept and be bound by the provisions of the Labor Agreements for execution of all work as required for completion of this [contract],
 
 The Labor Agreements contain definitions of the specific work covered.”
 

 (Emphasis added.)
 

 In 2002, Leslie was referred by a labor union to GUBMK for employment at TVA’s Widow’s Creek Fossil Plant (“the plant”). GUBMK had payroll offices located on the premises of the plant. At that time, Leslie was hoping eventually to be
 
 hired by TVA.
 
 On April 22, 2002, Leslie accepted
 
 employment by GUBMK
 
 as a “deck hand (laborer),” that is, to be “staff augmentation” for TVA, pursuant to ¶ GC-15 of the contract. Leslie executed the forms necessary to allow GUBMK to withhold payroll taxes and union dues from his paychecks. GUBMK also gave Leslie a copy of the “G.UB.MK Constructors Orientation Manual for Trades and Labor Employees” (“the manual”). The manual, which consist of 26 pages, sets forth “policies, processes, procedures and requirements applicable to G.UB.MK work,” purporting to vest in GUBMK control over such matters as substance abuse, safety regulations, absenteeism, and time-keeping.
 

 Leslie was paid based on a wage scale set forth in the Project Maintenance and Modifications Agreement and the Construction Project Agreement (hereinafter referred to collectively as “the labor agreements”), to which GUBMK was required
 
 *484
 
 by ¶ GCM9 of the contract to become a signatory. He worked exclusively on TVA property, using equipment owned and supplied by TVA. For all the work he performed, Leslie’s TVA supervisors kept track of his hours and provided the time sheets to GUBMK, whose employees then calculated his wages. Next, GUBMK would submit those calculations to TVA, which would deposit into GUBMK’s bank account the appropriate amount to cover the paycheck. Leslie’s paychecks would then be drawn on GUBMK’s bank account. TVA provided workers’ compensation insurance for Leslie and all such staff-augmentation personnel supplied by GUBMK.
 

 On the night of March 16, 2008, Leslie was working with Garner, a regular TVA employee. In the course of performing their assigned duties, Garner was injured. Garner received payments for lost wages and medical expenses from the United States Department of Labor Office of Workers’ Compensation Programs.
 

 On February 7, 2005, Garner sued GUBMK and Leslie. His complaint as last amended asserted negligence as the single claim for relief. GUBMK and Leslie answered the complaint and asserted as an affirmative defense that Garner’s claims were “barred by the provisions of the Alabama Workers’ Compensation Act ... in that [Garner] and the defendant Eric M. Leslie were co-employees at the time of the accident.” Meanwhile, in June 2004, Leslie became employed directly by TVA.
 

 The case was tried to a jury in December 2008. At the close of all the evidence, GUBMK and Leslie moved for a judgment as a matter of law (“JML”) on the ground that the evidence established that TVA was Leslie’s “special employer” for purposes of the application of the Act. The trial court denied their motion and submitted the case to the jury pursuant to a special interrogatory on the employment issue. In its answer to the special interrogatory, the jury found that Leslie was
 
 not
 
 the “special employee of TVA on March 16, 2003,” and awarded Garner $525,000.
 

 Subsequently, GUBMK and Leslie filed a renewed motion for a JML, which the trial court denied. They then filed this appeal. The sole issue on appeal is whether the trial court erred in declining to hold, as a matter of law, that Leslie was the special employee of TVA at the time of the accident and, therefore, that Garner’s action was barred by the exclusivity provisions of the Act.
 

 II. Discussion
 

 At the outset, we note that “when a defendant in a common law action for damages asserts that the action will not lie because the injured person or decedent was a ‘special employee’ of the defendant, the defense is an affirmative one, and the burden rests on the defendant to plead and prove it.”
 
 Hicks v. Alabama Power,
 
 623 So.2d 1050, 1052 (Ala.1993).
 

 A. Leslie and GUBMK’s Burden and the Standard of Review
 

 The following principles are well settled:
 

 “The first prerequisite for JML in favor of a movant who
 
 asserts
 
 a claim or an affirmative defense is that the claim or affirmative defense be valid in legal theory, if its validity be challenged.
 
 See Driver v. National Sec. Fire & Cas. Co.,
 
 658 So.2d 390 (Ala.1995). The second prerequisite for JML in favor of
 
 such a movant,
 
 who necessarily bears the burden of proof,
 
 American Furniture Galleries v. McWane, Inc.,
 
 477 So.2d 369 (Ala.1985),
 
 McKerley v. Etowah-De-Kalb-Cherokee Mental Health Board, Inc.,
 
 686 So.2d 1194 (Ala.Civ.App.1996), and
 
 Oliver v. Hayes International
 
 
 *485
 

 Corp.,
 
 456 So.2d 802 (Ala.Civ.App.1984), is that each contested element of the claim or affirmative defense be supported by substantial evidence.
 
 See Driver, supra,
 
 and
 
 McKerley, supra.
 
 The third prerequisite for JML in favor of such a movant is that the record be devoid of substantial evidence rebutting the movant’s evidence on any essential element of the claim or affirmative defense.
 
 See Driver, supra,
 
 and
 
 First Fin. Ins. Co. v. Tillery,
 
 626 So.2d 1252 (Ala.1993). Substantial rebutting evidence would create an issue of fact to be tried by the finder of fact and therefore would preclude JML.
 
 See Driver, supra,
 
 and
 
 First Financial, supra.
 
 JML in favor of the party who
 
 asserts
 
 the claim or affirmative defense is not appropriate unless all three of these prerequisites coexist.
 
 See Driver, supra,
 
 and
 
 First Financial, supra, McKerley, supra,
 
 and
 
 Oliver, supra.”
 

 Ex parte Helms,
 
 873 So.2d 1139, 1143 (Ala. 2003).
 

 B. Special-Employment Doctrine
 

 “In
 
 Marlow v. Mid-South Tool Co.,
 
 535 So.2d 120, 123 (Ala.1988), this Court stated:
 

 “ ‘In what has come to be taken as a statement of the test for establishing a special employer’s right to rely on the exclusivity of the workmen’s compensation remedies, this Court [in
 
 Terry v. Read Steel Products,
 
 430 So.2d 862, 865 (Ala.1983),] quoted the following test from 1C A. Larson,
 
 The Law of Workmen’s Compensation,
 
 § 48 (1980):
 

 “ ‘ “When a general employer lends an employee to a special employer, the special employer becomes liable for workmen’s compensation only if “ ‘ “(a) the employee has made a contract of hire, express or implied, with the special employer;
 

 “ ‘ “(b) the work being done is essentially that of the special employer; and
 

 “ ‘ “(c) the special employer has the right to control the details of the work.
 

 “ ‘ ‘When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen’s compensation.” ’
 

 “See, also,
 
 Means v. International Systems, Inc.,
 
 555 So.2d 142 (Ala.1989);
 
 Bechtel v. Crown Cent. Petroleum Corp.,
 
 [495 So.2d 1052 (Ala.1986)], and
 
 Pettaway v. Mobile Paint Manufacturing Co.,
 
 467 So.2d 228 (Ala.1985).”
 

 Pinson v. Alabama Power Co.,
 
 557 So.2d 1236, 1237-38 (Ala.1990). Thus, in support of their motion for a JML, Leslie and GUBMK had to produce substantial evidence indicating (1) that an employment agreement, either express or implied, existed between Leslie and TVA, (2) that the work Leslie was performing the night of the accident made of basis of this action was essentially the work of TVA,
 
 and
 
 (3) that TVA had the right to control the details of Leslie’s work. Substantial evidence rebutting any of these essential elements would create an issue of fact properly resolved by the jury.
 

 1. Work and Control
 

 We have no difficulty in holding that Leslie and GUBMK have satisfied the prerequisites for a JML as to these two conditions of the special-employment doctrine. There was substantial evidence indicating that the work Leslie was doing at the time of the accident was essentially the work of TVA, and there was no substantial evidence to the contrary. John Simonetto,
 
 *486
 
 a representative of GUBMK, testified that GUBMK had no contracts with any other entity but that it “employ[s] individuals for TVA work and
 
 solely
 
 [for] TVA work.” (Emphasis added.) He stated that GUBMK’s workforce ranged from 3,000 to 5,000 employees at any particular time, depending on the size of the work force needed by TVA at that time. He also testified that TVA provided all the materials and equipment for GUBMK’s employees, and that Leslie was hired as “staff augmentation” for TVA pursuant to the “staff-augmentation” provisions of the contract. Leslie testified that from the beginning of his relationship with GUBMK, he never worked anywhere but at the plant.
 

 It was undisputed that on the night of the accident Leslie was assisting Garner in Garner’s employment with TVA. Specifically, Leslie had transported Garner in a truck owned by TVA to the location of a railroad switch. Garner got out of the vehicle to switch the railroad tracks, and Leslie began to drive away. Garner then directed Leslie to return with the truck. However, when Leslie put the truck in reverse and attempted to back up, he ran over Garner. The work Leslie was performing at that time was essentially that of TVA as a matter of law.
 

 Similarly, Leslie and GUBMK offered substantial evidence that TVA had the right to control the details of Leslie’s work, and there is no substantial evidence to the contrary. In the context of the special-employment doctrine, the inquiry is not whether
 
 GUBMK “retained
 
 some control over [Leslie’s] work, but rather [whether
 
 TVA
 
 ]
 
 lacked the right
 
 to control his work.”
 
 Hamberg v. Sandia Corp.,
 
 143 N.M. 601, 604, 179 P.3d 1209, 1212 (2008) (emphasis added). This is so, because “the general employer and the special employer may
 
 ‘both
 
 exereise[ ] control over the employee and
 
 both
 
 benefitf ] to some degree from the employee’s work.’
 
 Restatement (Third) of Agency
 
 § 7.03 CMT. d(2) (2006).” 143 N.M. at 604, 179 P.3d at 1212 (emphasis added). See also
 
 Rhodes v. Alabama Power Co.,
 
 599 So.2d 27, 29 (Ala. 1992) (“The third element of the ‘special employer’ doctrine recognizes that both the general employer and the special employer may have concurrent rights to control the employee of both employers. The focus is on whether ‘the
 
 special employer
 
 has the right to control the details of the work’ of the employee, not which of the employers has such a right.”). The control element is satisfied where the special employer has “ ‘the right to control the time and place of the services, the person for whom rendered, and the degree and amount of services.’ ”
 
 Hamberg v. Sandia Corp.,
 
 142 N.M. 72, 81, 162 P.3d 909, 918 (Ct.App.2007),
 
 aff'd,
 
 143 N.M. 601, 179 P.3d 1209 (2008) (quoting 3 Arthur Larson
 
 &
 
 Lex K. Larson,
 
 Larson’s Workers’ Compensation Law
 
 § 67.06 (2006)).
 

 According to ¶ GC-15 of the contract,
 
 “¡aJll work activities
 
 of [GUBMK]-fur-nished support personnel [were to] be performed
 
 under the direction, supervision, and control of TVA,
 
 and
 
 TVA [was to] be responsible for requests and directions issued by employees of TVA to [GUBMK’s] ... employees
 
 providing support services to TVA [thereunder].” (Emphasis added.) That provision of the contract translated into reality on the job site. Leslie testified that when he would arrive for work, it was TVA’s foreman who would “tell[ ] him where to go, what to do, [and] all that stuff.” Indeed, he testified that, other than the amount of his wages and benefits, after he became employed directly by TVA in 2004, his “job duties, [his] foreman, [his] supervisor, [and]
 
 everything was the same
 
 ” as when he had worked for GUBMK. (Emphasis added.)
 

 
 *487
 
 Additionally, TVA could direct Leslie’s dismissal. More specifically, the contract provided that “TVA [would] have the right to reject any assigned support personnel considered by TVA, at any time, in its sole discretion, not to be acceptable or qualified to perform the assigned work.” ¶ GC-15. In that connection, Simonetto testified:
 

 “Q. [By counsel for Leslie and GUBMK:] And the question he specifically asked you about [was] reduction in force ... and
 
 termination for cause.
 
 My question for you is with the understanding that TVA dictated the terms of this [manual], who triggers these events?
 

 “A. [By Simonetto:] For a staff-augmented employee, reductions in force are triggered by TVA. TVA will notify us that the work assignment or the work is done and that they no longer need the individuals.... And for a termination for cause,
 
 TVA would basically tell us what that
 
 — 'why
 
 they want the individual terminated and for %vhat reason becatise [GUBMK] wouldn't have any idea what they ivould be terminated for.
 

 “Q. Okay. And, is that because [GUBMK] does not supervise that person’s work?
 

 “A. That’s correct.”
 

 (Emphasis added.)
 

 Regardless of whether GUBMK had retained some right of control over Leslie,
 
 Hamberg,
 
 148 N.M. at 604, 179 P.3d at 1212, it is clear that TVA had, as a matter of law, sufficient right of supervision and control to satisfy the third condition of the special-employment doctrine. See
 
 Rhodes v. Alabama Power Co.,
 
 599 So.2d at 29 (affirming a summary judgment for Alabama Power Company as the special employer, based on (1) testimony that Alabama Power “supervised the [general employer’s] employees and that the employees received all of them work instructions from Alabama Power,” and (2) a contract between Alabama Power and the general employer stating that “ ‘[a]ll work and activities of the ... personnel of [the general employer] at the Project shall be coordinated and scheduled by [Alabama Power] and shall be performed under the direct supervision and control of [Alabama Power]’ ”). It is immaterial that the manual purported to vest in GUBMK oversight or control of its employees in general matters involving safety and conduct. The manual merely provides some evidence indicating that GUBMK retained some control over its employees. It does not provide evidence of the necessary
 
 lack
 
 of control by TVA.
 

 2. Special Contract of Hire
 

 Whether there was substantial evidence that Leslie had made a contract of hire, express or implied, with TVA, and whether there was substantial evidence to the contrary so as to satisfy the first condition of the special-employment doctrine, requires only slightly more discussion than the preceding conditions.
 

 “ ‘Although the lent-servant doctrine is a familiar one at common law, ... the workmen’s compensation lent-employee problem is different in one significant respect: There can be no compensation liability in the absence of a contract of hire between the employee and the borrowing employer. For vicarious liability purposes, the spotlight was entirely on the two employers and what
 
 they
 
 agreed, how
 
 they
 
 divided control, how
 
 they
 
 shared payment, and whose work, as between themselves, was being done. No one paid much attention to the
 
 employee
 
 or cared whether he had consented to the transfer of his allegiance,
 
 *488
 
 since, after all, his rights were not usually as a practical matter involved in the suit. In the compensation law, the spotlight must now be turned upon the employee, for the first question of all is:
 
 Did he make a contract of hire with the special employer? ...
 

 ‘“This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence. ...’ ”
 

 Gaut v. Medrano,
 
 630 So.2d 362, 365 (Ala. 1993) (emphasis added) (quoting 1C A. Larson,
 
 The Law of Workmen’s Compensation
 
 §§ 48.11 and 48.12 (1980)).
 

 Clearly, while Leslie was employed by GUBMK there was no
 
 express
 
 employment contract between Leslie and TVA. Thus, we must determine whether there was substantial evidence that Leslie impliedly consented to a contract of hire with TVA, and, if so, whether there was substantial evidence to the contrary so as to present a question to be resolved by the jury.
 

 This Court has considered a number of factors to be particularly significant to the analysis of such a question. One consideration is whether the general employer is, in reality, acting as a “labor broker” or a temporary employment agency for the special employer.
 
 Hicks v. Alabama Power,
 
 623 So.2d at 1055;
 
 Gaut,
 
 630 So.2d at 367. Another consideration is whether the special employer provided the workers’ compensation insurance. See
 
 Gaut,
 
 630 So.2d at 363, 368 (holding that alleged special employer Holnam, Inc., which did
 
 not
 
 provide the employee’s workers’ compensation insurance, was not entitled to a summary judgment);
 
 Pinson v. Alabama Power Co.,
 
 557 So.2d at 1237 (holding that alleged special employer Alabama Power Company, which
 
 did
 
 provide the employee’s workers’ compensation insurance, was entitled to a summary judgment). Still another important consideration is ‘“whether the employment with the borrowing employer was of such duration that the employee could be reasonably presumed to have evaluated and acquiesced in the risks of his employment.’ ”
 
 Gaut,
 
 630 So.2d at 367 (quoting
 
 Vanterpool v. Hess Oil V.I. Corp.,
 
 766 F.2d 117, 122 (3d Cir. 1985)); see also
 
 Rast Constr., Inc. v. Peters,
 
 689 So.2d 781, 784 (Ala.1996). Always, the focus is on what the employee intended in providing services for the alleged special employer.
 

 Regarding the first consideration, we have explained:
 

 “Terry v. Read Steel [Products,
 
 430 So.2d 862 (Ala.1983),] and three of the cases following it [namely,
 
 Means v. International Systems, Inc.,
 
 555 So.2d 142 (Ala.1989);
 
 Marlow v. Mid South Tool Co.,
 
 535 So.2d 120 (Ala.1988); and
 
 Pettaway v. Mobile Paint Mfg. Co.,
 
 467 So.2d 228 (Ala.1985),] have involved general employers that were unambiguously temporary employment placement agencies. Terry and Pettaway were placed with their special employers by Manpower, Inc.; Marlow, by Kelly Services, Inc.; and Means, by Long’s Temporary Services, Inc. In such cases, the employee applies to the general employer for the specific purpose of temporary placement with special employers and thus necessarily agrees to a contract of hire with the special employer. For example, the Court in
 
 Pettaway, supra,
 
 stated: ‘Approximately two weeks before his injury, Manpower informed Petta-way of an available work assignment at Mobile Paint.
 
 Manpower asked Petta-way if he would accept such an assignment, as this was the normal procedure.
 
 
 *489
 

 Pettaway agreed to do so.
 
 ’ 467 So.2d at 228 (emphasis added).
 

 “In
 
 Bechtel v. Crown Central Petroleum Corp.,
 
 495 So.2d 1052, 1054 (Ala. 1986), Pep Services, Inc., had ‘agreed to supply Crown with gasoline filling station personnel.’ The opinion does not discuss how Bechtel started working with Pep or with Crown, but it recites the following facts in rejecting Bechtel’s argument that she had not consented to a contract of hire with Crown:
 

 “ ‘Bechtel submitted to the control and supervision of a Crown employee, Steve Thornton; Bechtel wore uniforms supplied by Crown, bearing Crown labels; Crown participated in the hiring process; the service station manager (a Crown employee) would sign the weekly time sheets and had authority to transfer Bechtel to another station or to terminate her. This is clearly evidence that Bechtel submitted to employment with Crown, as a special employer, and, therefore, entered into a contract of hire with Crown.’
 

 “Id.
 
 The Court stated that there was no evidence in the record that Bechtel had not consented to a contract of hire with Crown, and it affirmed the summary judgment for Crown.”
 

 Gaut,
 
 630 So.2d at 366.
 

 This ease is substantially similar to the typical labor-broker case. According to the contract and to the unrefuted testimony, GUBMK’s “principal work” was to augment TVA’s workforce “for the ... work ... identified by TVA at ... sites ... within the TVA region.” There was uncontroverted testimony that TVA provided all the necessary tools and work equipment for personnel performing staff-augmentation functions. Leslie received his daily work instructions and assignments from the TVA foremen and supervisors. These were the same foremen and supervisors who directed Leslie’s work after TVA became his
 
 general
 
 employer. A TVA supervisor kept track of Leslie’s hours and had the authority to direct his dismissal. Obviously, the “right to hire and fire” is indicative of an employment relationship. See
 
 Rast Constr., Inc. v. Peters,
 
 689 So.2d at 783.
 

 As for insurance, there was unrefuted testimony that the workers’ compensation coverage for GUBMK’s staff-augmentation personnel was provided and paid for by TVA. This consideration is particularly important, because, as GUBMK and Leslie argue, “if the special employer doctrine does not apply in such a situation, the employee is effectively suing the entity that provided his workers’ compensation insurance, which is contrary to the reasons for and provisions of the workers’ compensation statute.” Reply brief, at 23.
 

 Moreover, Leslie’s activities on behalf of TVA were “‘of such duration that [he] could be reasonably presumed to have evaluated and acquiesced in the risks of his employment.’ ”
 
 Gaut,
 
 630 So.2d at 367 (quoting
 
 Vanterpool,
 
 766 F.2d at 122). According to the uncontradicted testimony, by March 16, 2003, the date of the accident made the basis of this action, Leslie had worked at the plant for approximately 11 months. Every day he worked there, he performed the duties assigned him by personnel of TVA, using tools and equipment provided him by TVA. “[T]his is not a case of an employee’s being lent to another employer for a very short time or being lent on an
 
 ad hoc
 
 basis and thus having little or no reason to actually consent to a contract of hire with the borrowing employer.”
 
 Gaut,
 
 630 So.2d at 367.
 

 This case is distinguishable from
 
 Gaut,
 
 where the plaintiff asserted, among other things, “that he always believed that ... [the alleged special employer] was
 
 [not
 
 ]
 
 *490
 
 his employer” and that “he believed [his general employer] was an independent maintenance contractor.” 630 So.2d at 365 (bracketed language added). It is likewise distinguishable from
 
 Hicks, supra,
 
 where the plaintiff asserted “that once he secured employment with [his general employer],
 
 he did not expect or intend
 
 [the general employer] to then transfer him to [the alleged special employer’s] employ.” 623 So.2d at 1055 (emphasis added). By contrast, in this case, Leslie testified that he accepted employment with GUBMK with the hope and expectation that that employment would eventually ripen into direct employment with TVA. Indeed, his testimony implied that employment with GUBMK was commonly understood to be a stepping-stone to direct employment by TVA. Specifically, he stated:
 

 “Q. [By Garner’s counsel]: When you started working for [GUBMK] in 2002 and on through 2003 and exactly up until your hire date with TVA in 2004,
 
 was it fair to say you were hoping that TVA was going to hire you?
 

 “A. [By Leslie]: Fes,
 
 sir.
 

 “Q. And that happened, didn’t it?
 

 “A. Yes, sir.
 

 “Q.
 
 You work with some people over at TVA now,
 
 TVA employees,
 
 toho kind of went through the same process,
 
 right?
 

 “A.
 
 Yes, sir.
 

 “Q. And, of course, I guess you knew some people at [GUBMK] who never got hired by TVA, right?
 

 “A. Yes, sir.”
 

 (Emphasis added.)
 
 [2]
 

 Garner relies on the provision in the contract stating that “[GUBMK’s] employees providing support services to TVA hereunder shall continue as [GUBMK’s] ... employees, ... and shall not become employees of TVA.” However, Leslie was not a party to the contract and there was no evidence indicating that he ever saw it or was aware of this provision. “ ‘While employers certainly may contract as between themselves to define their business relationships and accomplish their business objectives, an agreement between the employers may not be determinative of the issue of special employment.’ ”
 
 Hamberg v. Sandia Corp.,
 
 142 N.M. at 82, 162 P.3d at 919 (quoting
 
 Thompson v. Grumman Aerospace Corp.,
 
 78 N.Y.2d 553, 559-60, 585 N.E.2d 355, 358-59, 578 N.Y.S.2d 106, 109 (1991)). This is especially true in this case, where the contract
 
 also
 
 provided that
 
 “TVA shall be solely responsible for the acts or omissions of such personnel during the assignment of such personnel to TVA and within the scope of their TVA-assigned duties.”
 
 (Emphasis added.) Such a provision is, of course, inconsistent with Garner’s insistence that GUBMK was an independent contractor.
 

 Garner also relies on the fact that TVA did not actually calculate Leslie’s wages or pay him
 
 directly.
 
 More specifically, Garner states: “[GUBMK] paid Mi*. Leslie’s paycheck. TVA’s name was not on the check.... After Mr. Leslie was hired by TVA in 2004, he began receiving paychecks that had TVA’s name on them.” Garner’s brief, at 9-10. However, this procedure differed in no meaningful respect from the procedure employed in
 
 Pin-son.
 

 In
 
 Pinson,
 
 Alabama Power Company (“APCo”) had “entered into a contract with
 
 *491
 
 Ellard Contracting Company, Inc. (‘El-lard’), wherein Ellard agreed to provide APCo with workers and to supervise them in connection with APCo’s Mitchell Dam redevelopment project.” 557 So.2d at 1236. “Under the contract, APCo retained the right to ... require the dismissal of workers under certain circumstances; and to supervise and control the manner or methods of work performed by the workers.” 557 So.2d at 1236-37. Additionally, “APCo prepared and maintained the payroll time records, calculated the amount of wages ..., and deposited the necessary funds into a special Ellard bank account from which Ellard made withdrawals to meet its payroll.” 557 So.2d at 1237.
 

 Thomas Pinson, “an ironworker, was hired pursuant to that contract and was designated therein as an employee of El-lard.” 557 So.2d at 1236. After Pinson was injured, he sued APCo on the theory that APCo had failed to provide a safe work environment. The trial court entered a summary judgment for APCo, holding that APCo was Pinson’s special employer, and this Court affirmed that judgment.
 

 To be sure, there is a distinction in this case, but it is a distinction without a difference. GUBMK, not TVA, actually calculated Leslie’s wages. However, it did so on the basis of a wage scale set forth in the labor agreements, in which GUBMK had no input, but to which it was
 
 required by
 
 ¶
 
 GC-U9 of the contract to become signatory.
 
 Moreover, it did so in conjunction with time records kept by TVA. In other words, the fact that the general employer in this case ministerially calculated the amount of the employee’s paycheck does not materially change the analysis.
 
 [3]
 
 See
 
 Pettaway v. Mobile Paint Mfg. Co.,
 
 467 So.2d 228 (Ala.1985) (holding that indirect payment of wages does not preclude a finding of a special-employment relationship).
 

 III. Conclusion
 

 In the final analysis, Leslie and GUBMK presented substantial, unrebut-ted evidence (1) that an implied employment agreement existed between Leslie and TVA, (2) that the work Leslie was performing the night of the accident made of basis of this action was essentially that of TVA, and (3) that TVA had the right to control the details of Leslie’s work. The trial court erred, therefore, in denying the motion for a JML filed by GUBMK and Leslie. Consequently, the judgment is reversed, and the case is remanded for the entry of a judgment in favor of GUBMK and Leslie.
 

 REVERSED AND REMANDED.
 

 COBB, C.J., and SMITH, PARKER, and SHAW, JJ., concur.
 

 [1]
 

 . While this appeal was pending, Gamer died and Darlene Garner, as administratrix for the estate of Wendell Garner, deceased, was substituted as the appellee. See Rule 43(a), Ala. R.App. P. For ease of reference, the appellee is referred to as ''Garner” in the remainder of the opinion.
 

 [2]
 

 . Perhaps it bears repeating at this point that the question is not whether GUBMK was Leslie’s
 
 general
 
 employer; that is undisputed. The question is whether he was
 
 also
 
 employed by TVA as the special employer. See
 
 Terry v. Read Steel Prods.,
 
 430 So.2d 862, 866 (Ala. 1983) (in the special-employment context, an employee may have dual employment).
 

 [3]
 

 . Indeed, this Court regards such an arrangement as consistent with a typical labor-broker arrangement. See
 
 Gaut,
 
 630 So.2d at 367 (characterizing
 
 Pinson
 
 and
 
 Rhodes
 
 as involv-mg labor brokers but distinguishing labor brokers from "temporary employment placement agencies”).