Rel: May 19, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2022-2023

————————————————

### SC-2022-0860

————————————————

## Ex parte Midsouth Paving, Inc., and Christopher Nivert

## PETITION FOR WRIT OF MANDAMUS

## (In re: Yvonne Mason

## v.

## Midsouth Paving, Inc., and Christopher Nivert)

## (Tallapoosa Circuit Court, CV-20-900093)

STEWART, Justice.

Midsouth Paving, Inc. ("Midsouth"), and Christopher Nivert have petitioned this Court for a writ of mandamus directing the Tallapoosa Circuit Court ("the trial court") to enter a summary judgment in their favor in an action commenced against them by Yvonne Mason. For the reasons explained below, Mason's claims against Midsouth and Nivert are barred by § 25-5-11, § 25-5-52, and § 25-5-53, Ala. Code 1975, of the Alabama Workers' Compensation Act ("the Act"), § 25-5-1 et seq., Ala. Code 1975. Accordingly, we grant the petition and direct the trial court to enter a summary judgment in favor of Midsouth and Nivert.

<u>Facts and Procedural History</u>

PeopleReady, Inc., is a temporary-employment agency that recruits, hires, and supplies temporary employees for Midsouth, a road-paving contractor, through a contractual agreement ("the labor-supply agreement").[1] In June 2020, Mason applied with PeopleReady to work as a flagger. On July 2, 2020, Mason attended training provided by Midsouth, and, shortly thereafter, she began accepting assignments as a flagger at Midsouth job sites. During her employment with PeopleReady,

---

[1]The labor-supply agreement was entered into between Midsouth's parent company, CRH Americas, Inc., f/k/a Oldcastle, Inc., and PeopleReady's parent company, TrueBlue, Inc.

Mason worked as a flagger only at Midsouth job sites. Mason would receive a daily text message from PeopleReady with a list of available flagging jobs, and Mason had the option to accept or reject the jobs. If Mason accepted a job, she would go to the PeopleReady office where she would receive a "ticket" to take to the Midsouth job site. PeopleReady initially provided Mason with a hard hat, sunblock, water, and a vest with "Midsouth" printed on it, and Mason kept those items in her automobile. At the job site, Midsouth employees directed and supervised Mason's job duties. Mason's flagging duties generally included holding a sign that said either "Stop" or "Slow" to help with redirecting traffic led by a pilot vehicle during road-paving jobs. At the end of each shift, a Midsouth supervisor would verify the hours Mason worked on her ticket, and Mason would return the ticket to the PeopleReady office.

On August 13, 2020, Mason was working at a Midsouth job site when Nivert unintentionally drove his pilot vehicle into Mason while he was making a three-point turn. Mason's leg was severely injured, and she received multiple surgeries and remained in a hospital and then a rehabilitation facility for over a month. PeopleReady began paying workers' compensation benefits to Mason after the accident and also paid

for her continued medical care. Pursuant to the labor-supply agreement, Midsouth was an insured alternate employer under PeopleReady's workers' compensation insurance policy.

On November 2, 2020, Mason commenced an action against Midsouth and Nivert in the trial court, asserting claims of negligence; wantonness; negligent hiring, training, and supervision; and negligence per se. Midsouth answered the complaint and raised numerous affirmative defenses, including immunity under § 25-5-52 and § 25-5-53 of the Act ("the exclusive-remedy provisions"). Nivert filed a separate answer and raised, among other defenses, the exclusive-remedy provisions and asserted that Mason's claims did not meet the requirements of § 25-5-11 of the Act, which, generally, requires willful conduct to support a civil claim against a co-employee.

Midsouth and Nivert jointly moved for a summary judgment, asserting that Mason had been a "special employee" of Midsouth's, that Mason had not alleged willful conduct on the part of Nivert, and that, therefore, the exclusive-remedy provisions and § 25-5-11 barred her claims against Midsouth and Nivert. Midsouth and Nivert supported their motion with, among other evidence, deposition testimony from

4

various employees of Midsouth and PeopleReady and other documents relating to Mason's employment relationship with Midsouth and PeopleReady, including a document that Mason had signed entitled "Employment Terms and Acknowledgements" ("the employment agreement"), which contained the following relevant provision:

> "16. I understand that my employer provides temporary associates for its customers to work at the customer's job site. While working at the customer's job site, I agree and consent that the customer is my special employer ('Special Employer') and that the customer directs, controls and supervises my work. Workers' Compensation shall be my sole remedy for on the job injuries. If I am ever injured in the course of my work I agree that I will elect, and solely rely upon [PeopleReady's] Workers' Compensation coverage for any recovery for such injuries, and waive any recovery whether civil or through workers' compensation, from any Special Employer. …"

Midsouth also submitted evidence indicating that Mason's job duties while on Midsouth assignments were directed, controlled, and supervised exclusively by Midsouth employees. PeopleReady paid Mason for the hours she worked at Midsouth assignments based on the hours verified on the ticket filled out by a Midsouth supervisor. However, PeopleReady submitted an invoice to Midsouth, and Midsouth paid PeopleReady Mason's hourly rate of $14.35 plus a 51% additional charge. That

additional charge was used by PeopleReady to pay for, among other expenses, workers' compensation insurance.

Mason filed a response in opposition to the summary-judgment motion in which she argued that genuine issues of material fact existed, thus precluding the entry of a summary judgment. Mason specifically asserted that she was an independent contractor, not a "special employee," of Midsouth. Mason supported her response with, among other evidence, the labor-supply agreement, which states, in relevant part:

"7. INDEPENDENT CONTRACTOR

"Supplier [i.e., PeopleReady] enters into this Agreement as an independent company. Supplier shall not in any way represent that it is an agent, employer, employee, partner, or legal representative of Customer [i.e., Midsouth] or any Customer Affiliate. As an independent contractor, Supplier is not authorized to make any contract, agreement, warranty, or representation on behalf of Customer or any of its Affiliates without Customer's express written prior approval. Supplier is solely responsible for the recruiting, screening, interviewing, selecting, testing, and hiring of all TAs [temporary associates]. TA [i.e., Mason] shall be considered solely an employee of Supplier and not employees or agents of Customer or any Customer Affiliate. Customer and its Affiliates will not treat TAs as Customer employees or Affiliate employees for purposes of worker's compensation insurance, federal or state income tax withholding, FICA withholding, or any other taxation purpose. ..."

Mason also submitted testimony indicating that she believed that she had been an employee of PeopleReady, that she had not intended to be a special employee of Midsouth, and that she believed that she had worked as an independent contractor for Midsouth. Mason also presented testimony indicating that she had intended to work for only PeopleReady because she had preferred having the ability to accept only the assignments she wanted and had not wanted to be constrained by another employer.

On August 10, 2022, the trial court entered an order denying Midsouth and Nivert's summary-judgment motion. Midsouth and Nivert petitioned this Court for a writ of mandamus.

Standard of Review

> "'The writ of mandamus is a drastic and extraordinary writ, to be "issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court." Ex parte United Serv. Stations, Inc., 628 So. 2d 501, 503 (Ala. 1993); see also Ex parte Ziglar, 669 So. 2d 133, 134 (Ala. 1995).' Ex parte Carter, … 807 So. 2d 534[,] 536 [(Ala. 2001)]."

Ex parte McWilliams, 812 So. 2d 318, 321 (Ala. 2001). The "denial of a summary-judgment motion based on a claim of immunity under the

exclusive-remedy provisions of the Workers' Compensation Act … is reviewable by a petition for a writ of mandamus." Ex parte Tenax Corp., 228 So. 3d 387, 391 (Ala. 2017)(citing Ex parte Salvation Army, 72 So. 3d 1224, 1228 (Ala. Civ. App. 2011)). In conducting our de novo review of whether a summary judgment is due to be granted on the basis of the applicability of the immunity afforded by the exclusive-remedy provisions of the Act, this Court considers whether the defendant established a prima facie showing as to each element of the defense raising the exclusive-remedy provisions and, if so, whether the plaintiff presented substantial evidence to overcome the defendant's prima face showing. Gaut v. Medrano, 630 So. 2d 362, 364 (Ala. 1993).

## Discussion

Midsouth and Nivert argue that they are entitled to a summary judgment because, they assert, Mason was a special employee of Midsouth's and, as a result, was barred from asserting claims against Midsouth and Nivert under the exclusive-remedy provisions of the Act. They further assert that Mason did not allege willful conduct sufficient to bring a claim against Nivert under § 25-5-11 of the Act. Section 25-5-52 provides, in part:

"Except as provided in [the Act], no employee of any employer subject to [the Act] ... shall have a right to any other method, form, or amount of compensation or damages for an injury or death occasioned by an accident or occupational disease proximately resulting from and while engaged in the actual performance of the duties of his or her employment and from a cause originating in such employment or determination thereof."

Section 25-5-53 provides, in part:

"The rights and remedies granted in [the Act] to an employee shall exclude all other rights and remedies of the employee, his or her personal representative, parent, dependent, or next of kin, at common law, by statute, or otherwise on account of injury, loss of services, or death. Except as provided in [the Act], no employer shall be held civilly liable for personal injury to or death of the employer's employee, for purposes of [the Act], whose injury or death is due to an accident or to an occupational disease while engaged in the service or business of the employer, the cause of which accident or occupational disease originates in the employment. In addition, immunity from civil liability for all causes of action except those based upon willful conduct shall also extend ... to an officer, director, agent, or employee of the same employer ...."

In addition, § 25-5-11 allows an injured employee to bring a cause of action against, among other third parties, a co-employee whose conduct was willful and contributed to the employee's injury, but it does not affect the immunity afforded the designated persons in § 25-5-53. See Padgett v. Neptune Water Meter Co., 585 So. 2d 900 (Ala. 1991)).

The exclusive-remedy provisions of the Act also provide immunity to any employer characterized as a "special employer" of an injured employee that satisfies the following three-pronged test adopted in <u>Terry v. Read Steel Products</u>, 430 So. 2d 862 (Ala. 1983):

> "'"When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation [and thus immune from liability for tort actions brought by the employee] only if
>
>> "'"(a) the employee has made a contract of hire, express or implied, with the special employer;
>>
>> "'"(b) the work being done is essentially that of the special employer; and
>>
>> "'"(c) the special employer has the right to control the details of the work.
>
> "'"When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation."'"

<u>Gaut</u>, 630 So. 2d at 364 (quoting <u>Terry</u>, 430 So. 2d at 865, quoting in turn 1C A. Larson, <u>The Law of Workmen's Compensation</u> § 48 (1980)).

There is no dispute regarding the second and third prongs identified in <u>Terry</u>; Mason was performing the work of Midsouth, and Midsouth controlled the details of her work. The issue is whether Mason expressly or impliedly consented to a contract of hire with Midsouth.

10

Mason argues, as she did in her response to Midsouth and Nivert's summary-judgment motion, that she did not expressly or impliedly consent to a contract of hire with Midsouth. Midsouth argues that Mason expressly consented to a contract of hire with Midsouth by signing the employment agreement with PeopleReady that specifically stated that Mason would be a special employee of PeopleReady's customers. The employment agreement between PeopleReady and Mason does not evince an express contract of hire between Midsouth and Mason; however, as discussed below, that agreement supports the contention that Mason impliedly consented to a contract of hire with Midsouth.

In determining whether a worker impliedly consented to a contract of hire with a special employer, this Court has considered several factors, including: 1) "whether the general employer is, in reality, acting as a 'labor broker' or a temporary employment agency for the special employer," G.UB.MK Constructors v. Garner, 44 So. 3d 479, 488 (Ala. 2010); 2) "whether the special employer provided the workers' compensation insurance," id., and 3) " ' "whether the employment with the borrowing employer was of such duration that the employee could be reasonably presumed to have evaluated and acquiesced in the risks of his

11

employment,"'" <u>id.</u> (quoting <u>Gaut</u>, 630 So. 2d at 367, quoting in turn <u>Vanterpool v. Hess Oil V.I. Corp.</u>, 766 F.2d 117, 122 (3d Cir. 1985)).

Midsouth asserts that it presented evidence affirmatively supporting the foregoing factors and, therefore, demonstrated that Mason had impliedly consented to a contract of hire with Midsouth. In particular, Midsouth presented evidence demonstrating that PeopleReady is a temporary-employment agency that provides temporary employees to Midsouth; that Midsouth paid PeopleReady an amount in excess of Mason's hourly rate to cover, among other expenses, premiums for workers' compensation insurance; and that Mason worked exclusively at Midsouth job sites, used Midsouth's equipment, and submitted to Midsouth's control.

PeopleReady is indisputably a temporary-employment agency, and it supplies temporary employees to Midsouth. In cases in which a temporary-employment agency places an employee with a special employer, "'"the employee applies to the general employer for the specific purpose of temporary placement with special employers and thus necessarily agrees to a contract of hire with the special employer."'" <u>Ex parte Tenax Corp.</u>, 228 So. 3d at 392 (quoting <u>Garner</u>, 44 So. 3d at 488,

quoting in turn Gaut, 630 So. 2d at 366). See also Hicks v. Alabama Power Co., 623 So. 2d 1050, 1054-55 (Ala. 1993)(discussing various cases involving employment agencies[2] and recognizing that the employees in those cases did not contact the employment agencies "for the purpose of entering into employment with those companies to do the work of those companies; rather, the plaintiffs intended for the general employers to 'market' them to secure employment with another, special employer" and that, "[o]nce those plaintiffs were presented by the employment services to the special employers, those plaintiffs then entered into a contract of hire with those special employers").

Midsouth presented evidence demonstrating that PeopleReady served as a temporary-employment agency that supplied temporary workers to various customers, including flaggers for Midsouth, and that Mason applied for employment with PeopleReady for the purpose of working as a flagger. Accordingly, Midsouth demonstrated that PeopleReady acted as a temporary-employment agency for Midsouth. See

---

[2]Terry v. Read Steel Prods., 430 So. 2d 862, 865 (Ala. 1983), Marlow v. Mid-South Tool Co., 535 So. 2d 120 (Ala. 1988), Bechtel v. Crown Cent. Petroleum Corp., 495 So. 2d 1052 (Ala. 1986), and Pettaway v. Mobile Point Mfg. Co., 467 So. 2d 228 (Ala. 1985).

13

Ex parte Tenax Corp., 228 So. 3d at 392 (quoting Garner, 44 So. 3d at 488).

The second consideration -- whether the special employer pays workers' compensation benefits, also weighs in favor of finding an implied contract of hire. Midsouth presented evidence demonstrating that PeopleReady physically paid Mason's wages but that, in return, Midsouth paid PeopleReady Mason's hourly wages, plus a 51% additional charge that was used by PeopleReady to pay for, among other expenses, workers' compensation insurance. Moreover, the labor-supply agreement required Midsouth to be an insured alternate employer under PeopleReady's workers' compensation insurance policy. As we have previously explained, whether a special employer participates in funding workers' compensation coverage is a "particularly significant" consideration, because permitting a civil action against an entity providing benefits under the Act would contravene the very purpose of the Act. Garner, 44 So. 3d at 489. See also Ex parte Tenax Corp., 228 So. 3d at 394 (placing import on evidence indicating that the alleged special employer paid a portion of the employee's workers' compensation insurance premiums). Therefore, Midsouth presented evidence showing

14

that it funded, at least in part, workers' compensation insurance that was used to cover Mason.

In addressing the third consideration -- whether the employee's employment with the alleged special employer "'was of such duration that the employee could be reasonably presumed to have evaluated and acquiesced in the risks of his employment,'" this Court has considered the frequency and exclusivity of the employee's work with the alleged special employer and the employee's understanding of the scope of the special employer's authority. Gaut, 630 So. 2d at 367 (noting that the employee had reported to the alleged special employer's workplace each workday, that he was aware that it was his ordinary workplace, and that he was aware that he was required to follow instructions of the special employer's supervisors). This Court distinguished cases in which an employee is briefly or randomly "lent to another employer," noting that, in those cases, the employee would have "little or no reason to actually consent to a contract of hire with the borrowing employer." Gaut, 630 So. 2d at 367. This Court in Gaut also discussed Pettaway v. Mobile Paint Manufacturing Co., 467 So. 2d 228, 230 (Ala. 1985), and highlighted the decision of the employee in that case to accept the employment agency's

15

offer of a work assignment as indicative of an implied contract of hire. 630 So. 2d at 366. Likewise, here, Midsouth presented evidence indicating that Mason had applied to PeopleReady to work as a flagger, that Mason had accepted only Midsouth job assignments during her employment with PeopleReady, and that Midsouth supervisors exclusively directed her job duties and verified her work hours. Moreover, as mentioned above, Mason signed an employment agreement with PeopleReady that specifically designated her as a "special employee" of the customer, i.e., Midsouth, and required her to acknowledge her understanding that Midsouth would direct, control, and supervise her work. Accordingly, Midsouth presented evidence demonstrating that Mason's employment with Midsouth "'was of such duration that [she] could be reasonably presumed to have evaluated and acquiesced in the risks of [her] employment.'" Gaut, 630 So. 2d at 367 (quoting Vanterpool, 766 F. 2d at 122).

Midsouth presented evidence demonstrating that PeopleReady acted as a temporary-employment agency for Midsouth, that Midsouth paid at least a portion of the premiums for workers' compensation insurance for PeopleReady's employees working for Midsouth, and that

16

Mason "'could be reasonably presumed to have evaluated and acquiesced in the risks of [her] employment'" from the duration of her employment with Midsouth. Id. As a result, Midsouth demonstrated that Mason impliedly consented to a contract of hire with Midsouth, and, as mentioned above, there is no dispute regarding the other two factors relevant to the determination of whether Midsouth was Mason's special employer -- Mason was performing the work of Midsouth, and Midsouth had the right to control the details of her work. See Terry, 430 So. 2d at 865. Accordingly, Midsouth made a prima facie showing of Mason's status as a special employee of Midsouth and, thus, the applicability of the immunity afforded by the exclusive-remedy provisions of the Act. As a result, the burden shifted to Mason to present substantial evidence demonstrating the existence of a genuine issue of material fact regarding her employment status with Midsouth. Gaut, 630 So. 2d at 364.

Mason asserts that a factual dispute exists as to whether there existed a mutual contract of hire with Midsouth and, ultimately, whether she was a special employee of Midsouth's. First, Mason asserts that Midsouth was precluded from entering into a contract of hire with her because of the provision in the labor-supply agreement that states that

temporary associates placed with Midsouth "shall be considered solely an employee of [PeopleReady] and not employees or agents of [Midsouth]." Mason argues that that "agreement constitutes strong and compelling evidence" that Midsouth was not Mason's employer in any capacity and that it foreclosed the possibility of Midsouth's offering a contract of hire to Mason. Mason relies on Hicks v. Alabama Power Co., in which this Court considered a similar provision in a contract between a general employer and an alleged special employer prohibiting an employee of the general employer from being considered an employee of the special employer. 623 So. 2d at 1054-55 (Ala. 1993). Hicks is distinguishable from the present case because, in Hicks, the general employer was not an employment agency; the employee was placed by a union for employment with the general employer, who provided contracting services to another company. Additionally, as mentioned above, the Court in Hicks noted the distinction between the factual scenario in that case and previous cases involving temporary-employment agencies. Moreover, this Court more recently considered an argument regarding a similar provision in a contract between a maintenance contractor (the general employer) and a utility company (the special employer) in Garner. The employee in that

18

case argued that he was not a special employee, and he relied on a provision in a contract between the companies stating that the maintenance contractor's employees that provided services to the utility company would continue to be considered the maintenance contractor's employees. Garner, 44 So. 3d at 490. This Court noted that the employee "was not a party to the contract and there was no evidence indicating that he ever saw it or was aware of th[at] provision." Id. This Court explained that, although "'"employers certainly may contract as between themselves to define their business relationships and accomplish their business objectives, an agreement between the employers may not be determinative of the issue of special employment."'" Garner, 44 So. 3d at 490 (quoting Hamberg v. Sandia Corp., 142 N.M. 72, 82, 162 P.3d 909, 919 (Ct. App. 2007), quoting in turn Thompson v. Grumman Aerospace Corp., 78 N.Y.2d 553, 559-60, 585 N.E.2d 355, 358-59, 578 N.Y.S.2d 106, 109 (1991)). The situation in Garner is much more analogous to the present case than is the situation in Hicks.

Mason also argues that Midsouth did not provide workers' compensation benefits, which, she asserts, presents a factual dispute as to the existence of an implied contract of hire. Mason relies on the

remainder of the provision in the labor-supply agreement considering temporary associates to be solely employees of PeopleReady that states that Midsouth would not treat the temporary associates as its own "employees for purposes of worker's compensation insurance, federal or state income tax withholding, FICA withholding, or any other taxation purpose." Regardless of the terms of the labor-supply agreement, the evidence presented indicated that Midsouth paid an amount in excess of the temporary associates' hourly wages for the purpose of covering additional expenses, including workers' compensation insurance, and Midsouth was required to be an insured alternate employer under PeopleReady's workers' compensation insurance policy. Accordingly, the labor-supply agreement between PeopleReady and Midsouth is not substantial evidence demonstrating that Mason did not impliedly consent to a contract of hire with Midsouth.

Mason also points to evidence that she presented indicating that, despite signing the employment agreement with PeopleReady addressing her status as a special employee with PeopleReady's customers, she was not aware that she would be considered a special employee, she did not know what a special employer was and no one explained that term to her,

20

and she did not realize that she was waiving her right to assert civil claims for injuries against PeopleReady's customers. However, this Court has explained that "when a competent adult, having the ability to read and understand an instrument, signs a contract, he will be held to be on notice of all the provisions contained in that contract and will be bound thereby." Power Equip. Co. v. First Alabama Bank, 585 So. 2d 1291, 1296 (Ala. 1991) (citing Massey v. Ingram, 567 So. 2d 1272 (Ala. 1990), and Norman v. Amoco Oil Co., 558 So. 2d 903 (Ala. 1990)). Therefore, Mason's ignorance of the terms of her employment agreement with PeopleReady does not serve as substantial evidence that she did not have an implied contract of hire with Midsouth or that she was not a special employee of Midsouth's.

Mason further points to her testimony that she intended to be an employee of only PeopleReady and that she never intended to be employed by Midsouth. Mason contends that she sought employment with PeopleReady because she wanted the flexibility of accepting or rejecting jobs based on her preferred schedule. It is undisputed, however, that Mason applied to PeopleReady for the purpose of working as a flagger. PeopleReady does not have employees who perform flagging

21

duties for it; instead, PeopleReady supplies employees to perform flagging duties for other companies, particularly Midsouth. See, e.g., Hicks, 623 So. 2d at 1054-55 (recognizing that the employees in Terry; Marlow v. Mid-South Tool Co., 535 So. 2d 120 (Ala. 1988); Bechtel v. Crown Central Petroleum Corp., 495 So. 2d 1052 (Ala. 1986); and Pettaway did not seek employment with the temporary-employment agencies to perform the work of those agencies but, instead, for the purpose of performing the special employers' work). Evidence of Mason's intent with respect to her employment is an important consideration. See Garner, 44 So. 3d at 488 (stating that "the focus is on what the employee intended in providing services for the alleged special employer"). However, the evidence Mason presented regarding her intent is not substantial evidence sufficient to overcome the evidence demonstrating that she was a special employee of Midsouth's.

Perhaps the most instructive case is Pettaway, the facts of which are largely indistinguishable from Mason's factual scenario. In that case, Pettaway was employed by Manpower, a temporary-employment agency. After three months' employment with Manpower, during which he had accepted temporary job assignments with various Manpower customers,

22

Pettaway accepted an assignment with Mobile Paint Manufacturing Company. Pettaway stopped by Manpower's office before and after his shifts at Mobile Paint's job site to obtain and return a timesheet. While working for Mobile Paint, Pettaway was supervised and directed by Mobile Paint employees. Pettaway received paychecks from Manpower, but Mobile Paint paid to Manpower Pettaway's wages and an additional charge that covered, among other expenses, premiums for workers' compensation insurance. After working for Mobile Paint for approximately three weeks, Pettaway was injured, and he commenced an action against Mobile Paint. The trial court in that case entered a summary judgment in favor of Mobile Paint, finding that it was Pettaway's special employer and, thus, that his claims were barred by the Act. Pettaway appealed, and this Court affirmed the summary judgment, determining that, under the facts, Mobile Paint was Pettaway's special employer. 467 So. 2d at 228-30. Likewise, here, Mason accepted job assignments with Midsouth, retrieved a timesheet from PeopleReady before each job, had it filled out by a Midsouth supervisor, and returned it to PeopleReady at the end of each shift; Mason's pay and workers' compensation insurance from PeopleReady was subsidized by

Midsouth; and Mason's specific job duties were assigned and controlled by Midsouth.

Applying this Court's precedent to the evidence presented, Midsouth demonstrated that Mason was a special employee of Midsouth's, and Mason failed to present substantial evidence to refute that she was a special employee of Midsouth's. In addition, Mason did not present any evidence or argument indicating that Nivert acted willfully in causing her injuries so as to permit a claim against him under § 25-5-11. Therefore, the immunity afforded in the exclusive-remedy provisions of the Act bars Mason's claims against Midsouth and Nivert. Accordingly, Midsouth and Nivert have demonstrated a clear legal right to a summary judgment in their favor.

PETITION GRANTED; WRIT ISSUED.

Parker, C.J., and Shaw, Wise, Bryan, Mendheim, Mitchell, and Cook, JJ., concur.

Sellers, J., concurs in the result.

24